1  THE FOLLOWING IS THE P.D.F. OF AN OFFICIAL TRANSCRIPT.  OFFICIAL

2  TRANSCRIPTS MAY ONLY BE FILED IN CM/ECF BY THE OFFICIAL COURT

3  REPORTER AND WILL BE RESTRICTED IN CM/ECF FOR A PERIOD OF 90 DAYS.

4  YOU MAY CITE TO A PORTION OF THE ATTACHED TRANSCRIPT BY THE DOCKET

5  ENTRY NUMBER, REFERENCING PAGE AND LINE NUMBER, ONLY AFTER THE

6  COURT REPORTER HAS FILED THE OFFICIAL TRANSCRIPT.  HOWEVER, YOU

7  ARE PROHIBITED FROM ATTACHING A FULL OR PARTIAL TRANSCRIPT TO ANY

8  DOCUMENT FILED WITH THE COURT.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF GEORGIA
 2                           ATLANTA DIVISION

 3
     FREDDIE CAGLE,                    )
 4                                     )
             PLAINTIFF,                )
 5                                     )      DOCKET NUMBER
          vs.                          )      2:21-cv-00052-RWS
 6                                     )
     WESCO INSURANCE CO., et al.       )      GAINESVILLE, GEORGIA
 7                                     )      February 6, 2023
             DEFENDANTS.               )
 8   _____)

 9

10                   TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
                   BEFORE THE HONORABLE RICHARD W. STORY,
11                      UNITED STATES DISTRICT JUDGE

12

13

14   APPEARANCES:

15
     FOR THE PLAINTIFF:          Andrew Quinn Gould
16                               Mark William Alexander
                                 Stewart Melvin & Frost, LLP
17
                                 Danny Ray Ellis
18                               Truck Wreck Justice, PLLC

19   FOR THE DEFENDANTS:         (No appearances)

20

21              MECHANICAL STENOGRAPHY OF PROCEEDINGS
22            AND COMPUTER-AIDED TRANSCRIPT PRODUCED BY

23   OFFICIAL COURT REPORTER:        DENISE M. STEWART, RPR
                                     1949-B UNITED STATES COURTHOUSE
24                                   75 TED TURNER DRIVE, SOUTHWEST
                                     ATLANTA, GEORGIA 30303
25                                   (404)215-1516
```

INDEX TO EXAMINATIONS

WITNESS                                                    PAGE

JERRY MICHAEL DURHAM

    DIRECT EXAMINATION BY MR. GOULD                      25

DEBRA CAGLE

    DIRECT EXAMINATION BY MR. GOULD                      30

JONATHAN LAWRENCE HEISEL

    DIRECT EXAMINATION BY MR. GOULD                      37

FREDDIE CAGLE

    DIRECT EXAMINATION BY MR. ALEXANDER                  43

LINDSEY CRIDER

    DIRECT EXAMINATION BY MR. ELLIS                      81

1           (IN ATLANTA, FULTON COUNTY, GEORGIA, FEBRUARY 6, 2023.)

2           THE COURTROOM DEPUTY:  The Court now calls for bench

3   trial in Civil Action 2:21-cv-52, Freddie Cagle v. Westco

4   Insurance Company, et al.

5           Counsel, please state your name for the record.

6           MR. ALEXANDER:  Mark Alexander on behalf of the

7   plaintiff.  Plaintiff is ready.

8           MR. GOULD:  Andrew Gould on behalf of the Plaintiff,

9   Your Honor.

10          MR. ELLIS:  Danny Ellis on behalf of the plaintiff, Your

11  Honor.

12          THE COURT:  Good morning.

13          Let the record reflect that there is no appearance on

14  behalf of any of the defendants here at today's hearing.  And of

15  course we are proceeding with the defendants in default.

16          Mr. Alexander, if you'd like to make a brief opening

17  statement, I'll give you that opportunity.

18          MR. ALEXANDER:  Thank you, Judge.  May it please the

19  Court.

20          Every nine seconds someone is injured in a tractor

21  trailer crash.  Wrecks involving large trucks, commercial motor

22  vehicles or people.  The Federal Motor Carrier Safety

23  Administration has developed truck safety rules designed to

24  prevent these crashes involving large trucks and the injuries it

25  causes and to protect all of us.

1              The importance of those safety rules is tied directly to
2    the danger that these large trucks pose every month.  Our system
3    will only work if the commercial motor carriers that violate these
4    rules are held accountable.  And that's really, really, really
5    what brings us here today.

6              A Florida couple, owned, operated and/or controlled a
7    series of trucking companies which habitually violated these truck
8    safety rules and openly flaunted any compliance with the Federal
9    Motor Carrier Safety Administration.  When their companies began
10   to feel the wrath of the Federal Motor Carrier Safety
11   Administration and also the D.O.T. authority, all they would do is
12   open a company and rename the existing company, keeping the same
13   trucks, trailers and bad business practices, unsafe business
14   practices.

15             This company and the companies repeatedly and
16   consciously disregarded the safety of others, including Mr. Cagle.
17   These defendants in default have also ignored the authority of
18   this Court by failing to participate in any of this civil
19   litigation.  This attitude of indifference led these defendants in
20   default to place an unqualified driver, Defendant Loyola behind
21   the wheel of an 80,000 pound tractor trailer travelling south on
22   I-85 in Jackson County, just past sort of the main commerce exit
23   on July 16, 2019.

24             As Mr. Loyola in the defendant's tractor trailer is
25   driving down I-85, again just past that exit, he encounters road

1  construction signs warning him of upcoming construction.  He

2  ignores those signs only to encounter a long line of slowed and

3  stopped traffic.  He does not slow down.  Suddenly there's what

4  Mr. Cagle -- we call him Freddie -- describes as an explosion, a

5  bomb that goes off just outside of the passenger door of his red

6  minivan.  When Mr. Cagle -- Freddie -- looks to the right to see

7  what happened.  He sees a white tractor trailer going up in the

8  air over another vehicle, tipping onto its side, crashing onto the

9  ground, and sliding towards him.

10        Mr. Cagle puts his arm out, sort of to protect the

11 passenger that's in the car with him, and then turns to the left

12 to avoid the mayhem that's happening just outside his car.

13        As he travels off of the roadway, sort of through the

14 grassy median, his foot comes off of the -- his right foot comes

15 off the gas pedal and gets hung underneath the brake.  The rough

16 ride through that grassy median tosses him around inside the van.

17 He hits his head and then he struggles to get his minivan to come

18 to a stop because his right foot is still stuck underneath the

19 brake.

20        After going to the emergency room later that afternoon,

21 and being released, he thinks, you know, maybe this wreck -- this

22 sort of rattled my bones, might of sprained my ankle, but

23 eventually my foot's going to get better.  It never did.

24        Just three surgeries and more than three years later the

25 wreck -- well, let me back up.  The wreck tore tendons, ligaments

1  and a nerve that ran along the outside of his right foot.  They
2  provided feeling, function and stability that was essential to his
3  ability to walk.  Three surgeries and more than three years later,
4  his right foot is still not the same.

5       It's been a long, miserable journey for Freddie,
6  complete with fear, hope for relief and bitter disappointment.
7  Freddie has learned, and the Court will see, that his ability to
8  walk without pain, without swelling, controlled much of his
9  freedom, much of his independence, much of his enjoyment of life,
10  much of his self-esteem, much of his self-identity.

11       This wreck broke Freddie Cagle.  It broke him physically
12  and in some degree it broke his spirit.  It stole his joy, a lot
13  of the joy that he has from doing the things that he loves to do.
14  He has not been able to walk without pain since the time this
15  wreck occurred and every step he will take for the rest of his
16  life will continue to cause him pain.

17       Freddie remains determined to live his life.  His will,
18  his pride sort of propel him to try to reach back and get to the
19  life he had before this wreck happened, albeit tempered by his new
20  reality and all that's associated with that new reality.

21       In just a minute, Mr. Ellis is going to come up here and
22  he will present to the Court evidence concerning the defendants in
23  default, their relationship to each other and their conscious
24  disregard for the safety of others.

25       You will hear from some of Freddie's family and friends

1  and you will hear from Mr. Cagle himself.  The Court will have the

2  evidence, Mr. Cagle's medical bills and medical records.  We

3  really don't anticipate, unless the Court desires us to, spend a

4  lot of time reviewing.

5        You'll also have before you in evidence the affidavit

6  from Dr. Johnson, the surgeon who performed a couple of these

7  surgeries on Mr. Cagle.  And we'll also have his video testimony

8  that basically describes kind of his treatment of Mr. Cagle and

9  the injuries that he sustained, how these injuries were caused by

10  this wreck.

11        THE COURT:  And counsel was kind enough to provide that

12  to the Court in advance of today's trial and the Court has

13  reviewed that video already.

14        MR. ALEXANDER:  Then we won't spend any time reviewing

15  that during this particular hiring.

16        And finally, Judge, I don't think we presented this to

17  the Court, my affidavit which sort of sets forth the evidence of

18  reasonableness of Mr. Cagle's contingency fee agreement.

19        At the conclusion of the evidence we'll ask the Court to

20  compensate Mr. Cagle for what the defendants have done and are

21  continuing to do as follows by entering a judgment.  If I may

22  approach briefly, I have sort of a summary of damages so the Court

23  would have some idea what that looks like.

24        And I'll review that briefly with you, Judge.  You can

25  kind of follow suit to figure it out.  We will be asking that all

1  the defendants, including Defendant Loyola -- a judgment against

2  them for Mr. Cagle's medical bills just over $310,000.  We will be

3  asking that the Court return a verdict or a judgment for pain and

4  suffering against all of the defendants, including Mr. Loyola for

5  just over $2,700,000.  That's reflected on that -- on the sheet

6  that's before the Court, the damages summary.

7          That brings the total compensatory damages that we are

8  asking the Court to award against all of the defendants to just

9  over $3 million -- $3,075,000, to kind of a round it to an even

10 number there.

11         Then, Judge, we are asking that the Court hold against

12 each of the defendants in default punitive damages.  And while we

13 believe that the conduct and the acts of the defendants are

14 intentional, we are only asking that the Court award punitive

15 damages of $250,000 against each of the defendants in default.

16         And when you add the punitive damages and the

17 compensatory damages to -- against the defendants in default.

18 That comes up to a term I reference as "gross proceeds" because

19 that's the term that's used in the contingency fee agreement that

20 we have and the contingency fee agreement is 40 percent.  So we

21 are asking that the Court to award against each of the defendants

22 in default as sanctions for bad faith and certain litigiousness

23 attorneys fees of $1,330,000.

24         And then if you add that attorney's fees figures to the

25 gross proceeds, you'll see there at the bottom we sum that up as

1  -- we're asking the Court to return a judgment against each of the

2  defendants in default of $4,605,000.

3           THE COURT:  Thank you.

4           MR. ALEXANDER:  I'll turn it over to Mr. Ellis.  If the

5  Court will indulge me, it may take us a moment to switch out.

6           THE COURT:  I understand.

7           MR. ELLIS:  Good morning, Your Honor.

8           THE COURT:  Good morning.

9           MR. ELLIS:  May it please the Court.

10           Your Honor, at this time, I'd like to mark Exhibits 1

11  through 5 and move them into evidence.

12           THE COURT:  Very well.  There being no objection,

13  they're admitted.

14           THE COURTROOM DEPUTY:  You can put them on that table

15  here at the end.

16           MR. ELLIS:  Your Honor, I'm not going to spend much time

17  on liability.  And I truly just want to address this on your

18  questions.  But I do want to start with the idea, Your Honor, that

19  we're here for one reason and one reason only.  And that's because

20  we have a group of individuals who are charged with only placing

21  qualified drivers behind the wheel.  And we know that one of the

22  qualifications that has been a major contention in this case has

23  been the ability to speak English and to read English.  And we

24  know, Your Honor, that has been a major issue with Mr. Loyola

25  because in his deposition we asked him, "Can you speak English?"

1       He says, "No, only a little bit."

2       We asked him if he can read English.  He says, "No."

3       And that's extremely important in this case because,
4   Your Honor, it could have been avoided had he seen the signs that
5   said, "Construction up ahead."  That would have prepared him as a
6   truck driver to start slowing down and be prepared for sudden
7   action, to maybe drop his speed that he could stop and not set off
8   the horrendous actions -- the mayhem on the roads that day.

9       Now, Your Honor, the only reason -- the only way that an
10  individual like Mr. Loyola can get behind the wheel is if somebody
11  puts him there.  And Your Honor had asked that we try to set up a
12  system so that Your Honor could see what's going on.  Your Honor,
13  this -- this whole enterprise is controlled by Ariel Calzada and
14  Isabel Cordero, which we laid out in our pretrial brief they're
15  married.  If I may, I will say that Ariel Calzada is the kingpin.

16      Your Honor, if I may, I just want to show you where this
17  starts with our story at the time of the wreck and then we'll move
18  back in time and move forward.

19      So Ariel Calzada starts King's Way.  But on the date of
20  the wreck, Your Honor, this is going to be the -- how do we get
21  King's Way in this case?  From what you'll see, Your Honor, is the
22  truck is owned by King's Way USA Transportation (sic).  That was
23  on the crash report the day of the wreck.

24      Now, if we go down to the bottom of this screen, Your
25  Honor, you'll see that -- let me try again.  If you go down to the

1  bottom of this screen, Your Honor, you will see that first time is
2  the authority -- the D.O.T. authority under which Mr. Loyola was
3  working.  Now, if we go back to our chart, you have to ask
4  yourself, well, wait a second.  I see that Calzada is in some way
5  connected to King's Way, AC Nationwide, One Way Hauling Express
6  and First Time.  How does -- how does First Time come into this
7  picture?

8  	    And again, Your Honor, I will come back to that word
9  "kingpin."  Looking at the testimony of Mr. Loyola, I think it's
10 very poignant.  If I may -- who is the owner of One Way
11 Transportation?  Ariel Calzada.  Who is his wife?  Isabel Cordero.
12 All that Mr. Loyola knows is that he's getting paid by Ariel
13 Calzada.

14 	    If you look further, Your Honor, and we only had one
15 person that we got to ask questions of and that would be
16 Mr. Loyola, and what his understanding was.  And if you'll look
17 back at our chart -- I could put that back up -- Osiel Tellez is
18 the president of First Time Transportation.  So then when we asked
19 Mr. Loyola who is Osiel Tellez, I thought it was very interesting
20 to see his comment here at the bottom:  "Oh, he's just one of the
21 chauffeurs but I didn't work for him."

22 	    Well, wait a second.  Why does he not think he works for
23 him, even though he's driving under his company with his
24 authority?  Because the kingpin is Ariel Calzada.

25 	    I think that the biggest tell of this, though, is Ariel

1  is in charge of everything as this testimony shows.  In fact, I'm
2  going to pull it out, right here.  He's the boss of everything.
3  And, Your Honor, if you're looking for the page on that, that's
4  going to be page 134.  Ariel Calzada is the boss of everything.
5  So much so that he handles the transportation; he handles the
6  mechanics; he tells who gets the loads; he tells them how to be
7  dispatched and ultimately he arranges for the payment of the load.
8  So that's how -- that's how King's Way, Ariel Calzada fits into
9  our story.

10        Now to not beat a dead horse, I want to bring this:
11 How, then, does AC Nationwide and how does One Way Hauling gets
12 involved in this litany of the mayhem?  Well, Your Honor, this
13 wreck was pretty -- and Your Honor saw the truck on the side, the
14 trailer.  The trailer had to be taken off and it was impounded.
15 And in order to get the trailer, this is going to be -- this is
16 going to be Exhibit 3, AC Nationwide 188.  The truck was paid for
17 by AC Nationwide LLC.

18        And Your Honor asked a very important question.  Well,
19 wait a second, how can I as a Judge impose a judgment on a
20 dissolved corporation?  And, Your Honor, what I would tell you is
21 Florida Statute 607.1405(2)(e) says there's nothing that prevents
22 this Court from instituting a judgment against a dissolved
23 company.  It's there.  This action was going on.  The fact they
24 put that check to get their trailer, which I think comes back
25 later, too, Your Honor.  And we pointed this out in our brief,

1  Mr. Loyola and Mr. Calzada had a conversation by phone in which

2  Mr. Calzada says, "You wrecked my truck.  You wrecked my trailer."

3  Now, how do we pull in or how does One Way get involved

4  in this?  Well, Your Honor, this is going to be in Exhibit 2.  And

5  we asked Mr. Loyola, "How are you getting paid?"  And fortunately

6  he got paid by check from One Way.  And, Your Honor, sometimes the

7  phrase, "It's better to be lucky than good," comes into mind.  The

8  only reason that we have this check is because Isabel Cordero

9  messed it up and he had to go back and get a new check.  And so

10  that's how we -- that's how we are connecting the dots between

11  King's Way, One Way and AC Nationwide and First Time.

12  First Time is obvious.  It's the placard on the side of

13  the truck.  In the old days that would have been enough.  But he's

14  obviously operating under the authority of First Time.  King's Way

15  is saying it's their truck.  Regardless, it's all owned by Ariel

16  Calzada and his wife.  And then when we asked specifically

17  Mr. Loyola about that, he's like, look, that's just a fiction that

18  Mr. Calzada created.  And I can show you that testimony if you

19  want.

20  Your Honor, I don't know how much you want me to go into

21  it, but I would like to show just a brief pattern with one of

22  these corporations so Your Honor can get a flavor for how this

23  goes.

24  THE COURT:  Let me ask you this.

25  MR. ELLIS:  Sure.

 1          THE COURT:  You don't really have to convince me about
 2   the web of the corporations and the leadership and what was
 3   operating here.  My bigger concern is the liability of them.
 4   Because in the papers you've submitted I see a real reliance on
 5   the regulations and the failure to follow the regulations.  And
 6   there were certificates getting revoked and all the rest.  The two
 7   questions in that regard because the primary thing you suggested
 8   that shows this driver was not qualified was that he is not an
 9   English speaker.  Do the regulations require that they be an
10   English speaker?  If so, how does one take a CDL licensing exam in
11   Spanish in Florida?  Is that required by the regulations?

12          MR. ELLIS:  Yes, Your Honor.  If I may go back to -- so
13   anytime I cite to a regulation, it's going to 49 CFR.  So this is
14   going to be 391.11 and it's going to be subsection (b)(2), "A
15   person is qualified" -- so, first, section (a) says, "A person
16   shall not drive unless he or she is qualified."

17          Section (b) says, "A person is qualified if they can
18   read and speak the English language."

19          And Your Honor, you have raised a question that that I
20   have wondered for four years -- for doing this for four years.
21   How -- if that's a requirement, can somebody take a CDL manual
22   test in Spanish or in Cyrillic or in -- and the problem you have,
23   Your Honor, is this is a requirement.  And without getting too
24   esoteric, 49 CFR 383.1 sets out what a driver's supposed to know.
25          If you go to 110, 111, and 113, it shows the knowledge

1  you're supposed to have and the skills they're supposed to have
2  which are to be demonstrated in a test that's put on by the State.
3  The State -- the State basically adopts 383.131.  That's the
4  testing mechanism where they say, okay, if you are going to get
5  these federal dollars and you're going to do this, you have to
6  have a booklet that at least has this.  What that -- Your Honor,
7  I'm sure is very well familiar with the CDL manuals.  Let me -- I
8  can pull one up here real quick.

9          You know, you've got to go through these exams.  And
10 what would have been at play here is, you know, basic control.
11 Now I have not actually gone into the section about seeing.  But
12 what I'm driving at, Your Honor, is there is a lack of enforcement
13 between the 131 and 391.11.  Only -- only so much so that it
14 places the onus on the motor carrier not to put somebody behind
15 the wheel that's not qualified.

16          THE COURT:  Well, I could see -- I was a little
17 surprised by the language because I can see in terms of the
18 universality of signs -- warning signs, I can drive in France but
19 I don't read French.  But there are signs that universally we know
20 these are warnings that something lies ahead and there's a danger
21 and you don't have to be able to read the language.  The
22 interesting part of this regulation is that they be conversant to
23 some extent in the English language, which I find surprising
24 because I would not have expected that.  But that -- certainly
25 it's there and part of the regulation.

1         MR. ELLIS:  I think it's there twofold, Your Honor.  So
2   I agree with Your Honor there are certain signs that are
3   universal:  Yield, stop.  If you see orange, that's construction.
4   However, there are things that aren't universal.  And that's the
5   flashing GDOT sign that you see going down the road.  Hey,
6   "prepare to merge; get over," those things.  And that's why it's
7   critical that a person reads English.  I would argue -- not argue.
8   I would propose, Your Honor, that one of the reasons you have to
9   converse in English is for those individuals who are driving
10  HAZMAT loads.  They need to know what they're hauling and if
11  something goes wrong, they need to be able to look at the
12  instructions and how to deal with it.

13        Unfortunately, right now I'm handling a major explosion
14  case over in Arkansas where you have ammonium nitrate in an
15  aluminum trailer.  You put those together, you get Tannerite in a
16  25-foot crater.  And nobody thought to look at the MDX sheets to
17  go hey, we can actually put water on ammonium prill and put this
18  fire out.  We don't have this problem.  Imagine that with a
19  non-English speaker, who can't even tell you what's in the truck?
20  That would be a problem.

21        So did I answer your question, Your Honor, about --
22        THE COURT:  Yes.
23        MR. ELLIS:  -- is it a requirement?
24        THE COURT:  Yes.
25        MR. ELLIS:  And I would argue, Your Honor, 391.1 and .3

1  places the onus on the quarter carrier not to let this happen.  So
2  there is that.

3         I will say this, Your Honor, and if I may, if you will
4  indulge me just briefly, it's not like this is an unknown thing
5  for Mr. Calzada.  If you look at one of the inspections that took
6  place on a King's Way truck when it had its operating authority --
7  I think this will also answer your question, Your Honor.

8         This is a -- this is an inspection that took place on
9  the interstate in New Mexico.  It was a walk around which I think
10 probably what happened, Your Honor, is they got pulled over.  And
11 there's two ways that a -- there's two ways that a commercial
12 motor vehicles can be inspected; either they've gotten a ticket or
13 they've done something to draw the ire of a trooper or a
14 commercial motor vehicle enforcement officer, or they're going
15 through a weigh station.  And the reason I think this is poignant,
16 Your Honor, if we look at the next page, this carrier -- this
17 truck and this trailer were pulled out of service.  That is what
18 the "OOS" means.  If you look at violation, it's 391.11(b)(2).

19        And just for -- Your Honor, just for clarification
20 purposes, this is exactly what they're pulling out.  They're
21 pulling these trucks -- this truck driver out of service because
22 they cannot speak English.  And this was back when King's Way had
23 authority.  And if it was a one-off, I would say it was a one-off.
24 But our brief points out they had more than one.

25        And the pattern and practice would be, the way I view

1    it, Your Honor, is they would file for authority.  When you enter
2    the new intern program, you have to open up your books and show
3    the Federal Motor Vehicle Safety Administration that you, A, you
4    understand and you have in place a mechanism to have training and
5    safety and how you're going to abide by the regs.  It's called a
6    "safety audit."  They immediately get contacted.  We need to
7    conduct a safety audit.  Let us know.

8         The way the pattern worked.  We had two letters.  We
9    tried.  Wait a few months.  Second letter.  Hey, you need to do
10   this or you're going to get a warning letter.  Wait three or
11   four months.  Get the warning letter.  I almost feel like I'm in
12   the supermarket.  Okay.  Johnny, one, two -- that's what I feel
13   like.  And then you get the revocation.  That's what happened with
14   King's Way.

15        Then when they got to AC Nationwide, they got smart.
16   One, all right, Johnny, one, two, three -- order of revocation.
17   They immediately refile.  And now they can extend it another year.
18   They started doing that with First Time.

19        But you have to ask yourself the question, Your Honor,
20   what makes One Way different?  Why does One Way still have
21   operating authority?  It's a very simple answer.  For some reason
22   they took a gamble and they let them do the inspection.  And what
23   I fear, Your Honor, is they will start doing this from now on.
24   Because now they get a blind eye for years, for years.  That's why
25   I put down One Way's MCMIS rating showing the alerts.  And the

 1  very -- I believe it's the very last in the exhibits, there's a
 2  letter saying, hey, we are going to need to come do an inspection
 3  because you guys are unsafe.  And so now instead of nine months,
 4  ten months grace period, I fear they are going to allow a safety
 5  audit to come in and extend these bad actors for another two or
 6  three years.

 7         THE COURT:  Hold on a second.

 8         (Pause in proceedings.)

 9         THE COURT:  The only thing that makes me feel good about
10  that is everybody heard the voices.

11         MR. ELLIS:  As long as they're not arguing back with us.

12         THE COURT:  That's right.

13         MR. ELLIS:  So that's why I hope I've answered your
14  first question.

15         THE COURT:  Yeah.

16         MR. ELLIS:  What's your second question?

17         THE COURT:  My second question you may not want to go
18  there yet.  And I regret not posing this to you in advance of the
19  hearing but it dawned on me this morning.

20         MR. ELLIS:  Yes, Your Honor.

21         THE COURT:  And I've spent a lot of time with this and I
22  can't believe it did not hit me before this morning, but it did
23  because I've dealt with this issue in some other trucking cases.
24  And that's the question of apportionment.

25         MR. ELLIS:  Okay.  That's a good question.  I think it's

1  handled in two ways, Your Honor.

2             (Discussion off the record.)

3             MR. ELLIS:  And Mr. Alexander has some of that, too.

4             MR. ALEXANDER:  Go ahead.

5             MR. ELLIS:  We've also made claims for illegal

6  brokering.

7             THE COURT:  Right.

8             MR. ELLIS:  All right.  So first and foremost there is

9  no -- there's joint and several liability under illegal brokering.

10 It's very clear here that Ariel Calzada, being the master kingpin,

11 is setting up loads without a brokering license.  If you're doing

12 it through King's Way, obviously.  If you're doing it through One

13 Way, that's Number one.

14             I also think, Your Honor, under Georgia law this would

15 be considered joint enterprise.  In actuality, that's exactly what

16 the reincarnated carrier -- motor carrier is.  It's we are going

17 to work in joint enterprise to pull this all the way through.  So

18 there you have your joint and several liability.  You get one, you

19 tag all.

20             THE COURT:  What about if between the employer -- the

21 respondeat superior nature, their negligence, their failure to do

22 what they were to do versus the negligence -- actual negligence of

23 the driver and differentiation between those?

24             MR. ELLIS:  Two things, Your Honor.  I would -- I would

25 say that respondeat superior is an operation of law.  That it's

 1  not so much under respondeat superior there's not an apportionment
 2  of damages.  It's I'm the employer, I'm 100 percent responsible
 3  for what this gentleman does.  But Your Honor is going to be
 4  tasked with apportioning default between King's Way, One Way --
 5  all those gentlemen or all those companies and the actual
 6  negligence of Loyola through direct negligence.

 7          I think that -- I do think you have to do that, Your
 8  Honor.  Now Mr. Alexander may disagree with me but I think that's
 9  what you have to do.  For purposes of this they're going to be
10  responsible for whatever Loyola's tagged with anyway because
11  they're his employer as already been found by them being in the
12  status of default.

13          THE COURT:  I think you're right.  And as Justice
14  Arrington wrote in a decision I had to grapple with in another
15  case.  And I reached the same conclusion you did, I don't think --
16  I'm not sure I completely disagree with -- I completely agree with
17  that approach because of the last point you made.  That is,
18  especially in a case where the employer admits that this person
19  was acting within the scope of their employment, which I would
20  find in this case based on the uncontradicted facts.  In the good
21  ole days when you could come in admit that, you got rid of the
22  negligent entrustment and all those other issues because it's
23  going to be one judgment against both.  I think under Justice
24  Arrington's decision I've still got to apportion, even though you
25  get to the end and you get --

1              MR. ELLIS:  And if I may address that just very briefly,

2    Your Honor.  I think this is exactly why the tort system is in

3    place.  I think this is exactly why Georgia has comparative fault.

4    And I know that sounds crazy but one of the hallmarks -- one of

5    the bedrocks of the tort system is to deter future wrongful

6    conduct.

7              And there is wrongful conduct here by all parties.  Now,

8    do I think that Loyola is as much a victim as Mr. Cagle, I kind of

9    do.  I mean, he's just trying to make a living.  However, that man

10   says I know I have a problem with -- I'm sorry.  That man knows

11   that I have to follow the federal motor carrier safety regs.  That

12   man knows he has to keep his commercial motor vehicle under

13   control.  And when it comes down to it, he caused this wreck.

14             And if I may, Your Honor, I know we're not looking at

15   punitive damages on Mr. Loyola but that man is still driving today

16   for another carrier, his cousin.  I could point you to the page

17   and line if you want.  He needs to learn the lesson.  All right.

18   But Ariel Calzada and crew need to learn the lesson too.  That is

19   we will not tolerate people ignoring the safety regulations whose

20   very purpose is to minimize death and crashes and severe injury.

21   And that's 383.1.  That's specifically spelled out there.  The

22   whole purpose of this knowledge and these regulations is so this

23   doesn't happen.

24             THE COURT:  You were beginning to touch on the liability

25   under 14916 -- 49.  And is the breadth of that liability in your

1   view it is -- it is all damage or injury caused thereby?

2           MR. ELLIS:  Correct.

3           If you read the illegal brokering statute, I don't want

4   to say it's strict liability but it's almost strict liability.

5   It's as close as I've seen ever seen for trucking.  In fact, Your

6   Honor, I think -- and this is not -- and we don't have this issue

7   here, but I also think it preempts any state law when it comes to

8   caps or anything like that.

9           But to answer your question, yes, it's -- it is to all.

10          THE COURT:  So that -- and this may be where you were

11  headed anyway.  So that even if there is apportionment in making

12  the decision of the damages under 14916, that doesn't come into

13  play because it's a statutory provision that lies outside the tort

14  realm?

15          MR. ELLIS:  Correct.

16          THE COURT:  Makes sense.  All right.

17          MR. ELLIS:  Are there any other questions, Your Honor?

18          THE COURT:  No.  But I think -- I think Mr. Alexander's

19  biting at the bit to talk about apportionment.

20          MR. ELLIS:  Yes, he is.

21          Your Honor that's all I have.  May I sit down?

22          THE COURT:  You may.  Thank you.

23          MR. ALEXANDER:  Judge, I'd rather -- if the

24  apportionment issue is a concern to the Court, I think I may

25  disagree a little bit with Mr. -- I don't think in some of the

1  more recent decisions I've when you have a vicarious liability
2  circumstance, that that necessarily is an apportionment of fault
3  that needs to take place under that vicarious liability pursuant
4  to respondeat superior.

5        But I understand the Court's concern.  And rather than
6  try to quickly cite all of these cases, if after the conclusion of
7  the presentation of the evidence, we could have until the end of
8  the week, or something like that, to give the Court maybe a letter
9  brief on the particulars, we're happy to do it.

10        THE COURT:  I hate to do this to you but I would like
11  you to -- more out of curiosity than anything else.  I don't think
12  it affects -- because of the last argument made by your cocounsel,
13  I'm not sure that affects where we end up at the end of the day
14  what's really important to your client here today.  But for my
15  curiosity -- and of course we want to get this right.  I want my
16  judgment to be able to withstand any challenge it may face.
17  Though I can't imagine how one would be faced in a default
18  situation like this.  But I would be curious because that's been a
19  troubling issue to me.  I would welcome your input in terms of the
20  apportionment issue because it's -- yeah, I will give you the
21  opportunity to do that after the hearing.

22        MR. ALEXANDER:  Thank you, Judge.

23        THE COURT:  You may proceed with further evidence that
24  you wish to present.

25        MR. GOULD:  May it please the Court, Your Honor.  We

1  would like to call -- the plaintiff would like to call the first

2  damage witness, Mr. Jerry Durham.

3        THE COURT:  Mr. Durham, if you'll come around through

4  there and come up to the witness stand here.  Yes, sir.  Just come

5  on.  Just come right up here.

6        If you will face Ms. Kemp and raise your right hand, she

7  will administer the oath to you.

8                    JERRY MICHAEL DURHAM,

9  having been first duly sworn/affirmed and testified as follows:

10        THE COURTROOM DEPUTY:  Please have a seat and state your

11  name for the record.

12        THE WITNESS:  My name is Jerry Michael Durham.

13        THE COURT:  Mr. Durham, that microphone moves.  So if

14  you can move it closer to you and you can scoot up to it, we'll

15  make sure we all hear and the court reporter hears what you're

16  saying as well.  Thank you.

17        You may proceed.

18        MR. GOULD:  Thank you, Your Honor.

19                    DIRECT EXAMINATION

20  BY MR. GOULD:

21  Q.  Mr. Durham, will you just please give a brief background on

22  yourself for Judge Story.

23  A.  I am a Southern Baptist ordained minister, 45 years in the

24  ministry.  My last pastorage was at Bethany Baptist Church in

25  Hartwell, Georgia, for 17 years.  And about 15 of those years I

1   was Freddie's pastor before I retired.

2       Now, presently I do supply preaching and serve as a chaplain

3   with Anderson County Sheriff's Department.

4   Q.  Okay.  And I think you answered this, but how did you come to

5   know Freddie?

6   A.  About two years after I went to Bethany I had visited Freddie

7   and his wife several times.  Someone gave me his name and Freddie

8   started coming to church.  And it wasn't very long before he came

9   to Christ and came to faith in Christ in our church.  And

10  Freddie's been a faithful member and he was there just about every

11  time we had service.

12  Q.  And just generally, for the Judge's education, how would you

13  describe Freddie from your perspective as a person?

14  A.  Freddie is a friendly person.  He will help anybody any way he

15  can.  He will go out of his way to help people.  I mean, he'd come

16  by my house and saw the pallet in the parsonage at that time with

17  a truckload of corn at that time and filled up my freezer.

18  Another time he came by with a truckload of squash and zucchini.

19  He's just that way.

20      He had property he gave me permission to hunt on and stuff

21  like that.

22  Q.  And when he did that, when he helped load up the corn or

23  quash, zucchini -- this would have been before the wreck, correct?

24  A.  Yeah.

25  Q.  Did you notice any physical limitations as far as his right

1  food or mobility?

2  A.  No, he had no problem.  He had no problem getting around.

3  Q.  As a preacher at the church, would the church ever go on any

4  kind of annual retreat or jubilee?

5  A.  Every year we went to jubilee.  It's a senior adult conference

6  that's held in Gatlinburg, Tennessee at the Gatlinburg Convention

7  Center.  Freddie and his wife went with us every year.  We had a

8  woman in our church who lived to be 101.  She went to that

9  conference up until she was 99.  And she always got the "Oldest

10  Member" out of 5,000 people at that conference.

11      When she was impaired as far as travelling because of her age

12  and so forth, she couldn't walk the distance from the motel to the

13  convention center.  So Freddie would put her -- and she had a

14  rolling chair.  It wasn't really a wheelchair but it was a chair

15  with big wheels on it and she could turn around and sit down on

16  it.  And Freddie would make sure that she got to the convention

17  center.

18      He took care of her.  He took care of her every time we went,

19  every year we always went.  We always went the last of September,

20  the 1st of October.  He always took care of her.  He'd make sure

21  Reba Johnson -- that was her name -- got to the convention center,

22  got a good seat.  And he would sit with her and take care of her.

23      Not only that, Freddie would go out of his way to pick

24  Ms. Johnson up and bring her to church, make sure she got in, roll

25  her in, get her a chair -- get her a place in the pew, and then

1  park that roller chair beside her pew.

2      This was -- this was Freddie's heart.  He would -- he lived

3  near the church.  He lived I guess a mile maybe from the church

4  but yet he would drive 2 miles in the opposite direction to pick

5  sure Ms. Reba up and make sure she got to church and got her pew.

6  Q.  I want to break that up.

7      Okay.  Starting with Pigeon Forge.  You said y'all went there

8  annually during your time?

9  A.  Yes.

10  Q.  And did I hear right, that Freddie would push Ms. Reba around

11  in Pigeon Forge?

12  A.  Yes, he would, to the lodge, anywhere she needed to go.  He

13  took care of her like she was his mother.

14  Q.  Any issue during that time with his foot or his ability to get

15  Ms. Reba around?

16  A.  No.  Freddie had no problem at all.

17  Q.  I have not been to Pigeon Forge in so long.  Is it flat or

18  hilly, up and down?

19  A.  It's hilly.  Where the convention center was and where our

20  motel was, about maybe 300 yards from the convention center but it

21  was up hill.  So he to push her down hill, but he had to push her

22  back up hill to get her to the motel.

23  Q.  Thank you.

24      Can you also inform the Judge just how Freddie -- you said

25  that he would pick up Ms. Reba, bring her to church.  But walk the

1  Judge in more detail how he would get Ms. Reba into the church.

2  A.  Well, we had handicapped accessible doors on each side of the

3  church where she couldn't come in the front because of the steps.

4  But we had those ramps on each side.  Freddie would make sure that

5  he'd park close enough where he could get Reba out, put her in her

6  chair and roll her through the ramp and through doors that came by

7  the pulpit area.  And she would always sit about the second row.

8  He had her seat.  She knew where she was going to sit, on the end.

9  He would park her chair there beside her.  And then after church

10  he would load her back up and take her back home.

11  Q.  Is that a short distance, would you say?

12  A.  Not real short but maybe 50 yards.

13  Q.  And any issue with his right foot doing that over the years

14  that you saw?

15  A.  No, he had no problem with his right foot.

16        MR. GOULD:  Those are all the questions I have, Judge.

17        THE COURT:  Thank you.

18        You may step down, sir.  Thank you.

19        You may call your next witness.

20        MR. GOULD:  Judge, you had mentioned earlier that you

21  had seen -- that you had seen the video of Dr. Johnson, but would

22  the Court like us to play the video of Dr. Johnson?

23        THE COURT:  No.  I had a chance to review it.  And,

24  quite honestly, my law clerk as well.

25        MR. GOULD:  Then plaintiff would call his next damage

 1  witness, Ms. Debra Cagle, who is the wife of plaintiff, Your

 2  Honor.

 3           THE COURT:   Thank you.

 4           Ms. Cagle if you would step up there and raise your

 5  right hand.

 6                        DEBRA CAGLE,

 7  having been first duly sworn/affirmed and testified as follows:

 8           THE COURTROOM DEPUTY:   Thank you please have a seat.

 9  State your name for the record.

10           THE WITNESS:   Debra Cagle.   I'm Freddie's wife.

11                      DIRECT EXAMINATION

12  BY MR. GOULD:

13  Q.   Good morning, Ms. Cagle.

14  A.   Good morning.

15  Q.   Would you tell the Court how long you and Freddie have been

16  married?

17  A.   Thirty-eight years.

18  Q.   Thirty-eight years.

19       When is the anniversary?

20  A.   When is the anniversary?

21  Q.   Yes, ma'am.

22  A.   March 28th.

23  Q.   So about to be 39 years?

24  A.   Yes.

25  Q.   Would you briefly just tell the Court how you and Freddie met.

 1  **A.**  Through his sister.  We was friends and Freddie said he wanted
 2  to go out.  I hesitated for a little while.  So we finally went
 3  out a few months later.
 4  **Q.**  And when was this?  When was this?
 5  **A.**  It was about March of the next year.
 6  **Q.**  Okay.  And forgive me, I may have missed it.  But you said
 7  38 years ago.  Were you and -- and I hate to ask a woman her age.
 8  Forgive me, Judge.
 9      But this would have been high school or would you have been
10  out of high school?
11  **A.**  High school.  High school.
12  **Q.**  Okay.  What was it about Freddie that brought you or kind of
13  attracted you to Freddie?
14  **A.**  Well, his looks for one.  He just had a good personality about
15  him.
16  **Q.**  Okay.  Tell the Judge about that personality.  Tell the judge
17  a little bit about that personality.
18  **A.**  Well, he's friendly and he's always good to everybody.
19  Anybody needs help, they come and see Freddie.
20  **Q.**  Has he been that way for the 38 -- almost 39 years you've been
21  with him?
22  **A.**  Yes.  Yes.
23  **Q.**  And I want to talk a little bit about before the wreck.  Okay.
24      Can you describe -- let me ask you this.  Were there moments
25  that you can recall where Freddie was Freddie and helped folks

1  out?

2  A.  Before the wreck?

3  Q.  Before the wreck, yes, ma'am.

4  A.  Yes.

5  Q.  Okay.  Can you share a moment or two with the Judge?

6  A.  Well, he was -- him and Greg was friends.  Greg Kaye.  He

7  passed away last year.  And he would always ride with Greg.  He

8  was a contractor.  And Greg would always come pick him up and

9  he'll ride with him and get checks and stuff like that.  And one

10  time he called him one day wanting him to ride to Texas with him

11  with all the boys and Freddie said yeah.  And I think they got

12  there and he might have slept four hours and they come straight

13  back.

14  Q.  And do you recall when he got back, did he have any complaints

15  of right foot pain or swelling, or anything like that from being

16  in the car that long?

17  A.  No.

18  Q.  Did Freddie hesitate when Greg asked him to drive him to

19  Texas, to your knowledge?

20  A.  No.  I did.

21  Q.  Any other times, whether it's with your sister or your mama,

22  where Freddie's been called on to help and he has not hesitated?

23  A.  Oh, yes.

24  Q.  Can you describe maybe a time or two when maybe your sister

25  has reached out?

1  A.  Yeah.  I've got a sister.  She's not married.  And Freddie

2  helps out a good bit around the house and do what he can do to

3  help her.

4  Q.  She's ever broken down on the side of the road?

5  A.  Yeah.

6  Q.  Freddie been there for her?

7  A.  Oh, yeah.

8  Q.  All right.  I want to -- I want to draw your attention to the

9  day of the wreck, okay, July 16, 2019.  Will you just share with

10  the Judge, how did you come to learn about the wreck?

11  A.  Well, Freddie had called Lindsey and Lindsey had called me and

12  I said, "Oh, Lord," because they had just had a wreck on 85 the

13  week before and it killed a bunch of people.  And I just -- you

14  know, it went through my head, Lord, what kind of shape is he in,

15  you know.  And just thank goodness it was just his foot.

16  Q.  How did he sound?  How did he sound when he called you?

17  A.  Nervous.

18  Q.  Did you know at the time he was as bad hurt as he turned out

19  to be?

20  A.  No, not until a little bit later.

21  Q.  Okay.  Talk a little bit about after the wreck.  Okay.  And I

22  want to talk about just kind of briefly -- Dr. Johnson when he

23  first started -- when Freddie started treating with Dr. Johnson,

24  okay.  I want to talk about after the first surgery that

25  Dr. Johnson did or second surgery that Freddie underwent and he

1  had that infection.  Okay.

2      Were you there when Dr. Johnson called him and told him to
3  come to the hospital?

4  A.  Yeah, I was.

5  Q.  All right.  And what is your understanding of why Dr. Johnson
6  wanted him to come to the hospital?

7  A.  Well, his foot looked pretty bad and he red streaks running up
8  his leg and it looked infected.

9  Q.  All right.  And when Dr. Johnson asked him to come to the
10 hospital, what were some of the thoughts going through your head?

11 A.  Well, I thought he was going to lose his foot.

12 Q.  Now, the Court's going to hear or the Court's familiar with
13 the medical records where Mr. Cagle at home had a PICC line for
14 antibiotics after that third surgery.  Okay.

15     Did you see that and the PICC line and the fluids going in?

16 A.  Oh, yeah.

17 Q.  How long, roughly, did that last?

18 A.  Two to three months.

19 Q.  And can you just share what that experience was like based on
20 what you saw for Freddie?

21 A.  Well, Freddie's always been outgoing.  And being stuck in the
22 bed that long he just, you know, makes you kind of depressed
23 laying in the bed and you can't do nothing else.

24 Q.  And did he spend most of his time during those few months in
25 the bed?

1  A.  Oh, yeah.

2  Q.  Was he able to get out of bed, though, and move around?

3  A.  Not much.  Go to the bathroom.

4  Q.  Would he ever need help doing that?

5  A.  Yeah.

6  Q.  And was that you doing it?

7  A.  Yes.

8  Q.  To this day do you see any kind of mobility issues with

9  Freddie with his right foot?

10  A.  He can't stay up a long period of time or walk a long period

11  of time because it still swells up and hurts and a lot of pain,

12  especially at night.

13  Q.  Is he able -- from what you've seen, is he able to help like

14  he did before?

15  A.  No.

16  Q.  All right.  Can you just explain a time or two where he wasn't

17  able to help the way he wanted to?

18  A.  Well, his foot -- he couldn't get up and go.  I mean, but he

19  would see that person got help.  He would call somebody to help

20  that person.  He just wouldn't let them go unhelped (sic).  That's

21  just the way he is.

22  Q.  All right.  Has this -- a couple other questions and then

23  we'll wrap up here, Ms. Cagle.

24      Has this injury affected his sleep in any way?

25  A.  Yeah.

1  Q.  Can you just describe for the judge how it affected his sleep

2  or what that's like from your perspective?

3  A.  He don't sleep all night.  He might sleep a few hours and

4  sleep, go sleep wake up, go sleep and wake up and sleep during the

5  day.

6  Q.  And what's your understanding of why that happens?

7  A.  His foot.

8  Q.  Have you seen -- we talked about the physical changes.  But

9  have you seen any other kind of changes with Freddie since the

10  wreck as far as personality or attitude?

11  A.  Well, he's not -- he don't get out and go like he used to.  He

12  never wanted to stay-at-home but he's around home more now.

13  Q.  Has that impacted him in anyway other than physically?

14  A.  I think emotionally.

15  Q.  All right.  How so?  What do you mean by emotionally?

16  A.  Well, being in the bed that long I think it just made him

17  depressed and stuff.

18  Q.  Was he like that before the wreck?

19  A.  No.

20          MR. GOULD:  Those are all the questions I have for

21  Ms. Cagle.

22          THE COURT:  You may step down, ma'am.

23          THE WITNESS:  Thank you.

24          THE COURT:  Call your next witness.

25          MR. GOULD:  Plaintiff calls as its next damage witness,

1   Mr. John Heisel.

2                    JONATHAN LAWRENCE HEISEL,

3   having been first duly sworn/affirmed and testified as follows:

4            THE COURTROOM DEPUTY:   Thank you.

5            Please have a seat and state your name for the record.

6            THE WITNESS:   Jonathan Lawrence Heisel.

7            THE COURT:   Spell your last name, sir.

8            THE WITNESS:   H-e-i-s-e-l.

9            THE COURT:   Thank you.

10                    DIRECT EXAMINATION

11   BY MR. GOULD:

12   Q.  Mr. Heisel, would you please just give the judge a little

13   background on yourself.

14   A.  Former military, former law enforcement, current security

15   officer.  I hunt and fish and read books.

16   Q.  What branch of the military?

17   A.  Air Force and Army.

18   Q.  And how long did you serve?

19   A.  A total of ten years.

20   Q.  How long were you in law enforcement?

21   A.  On and off different agencies, approximately 20 years.

22   Q.  Now, how did you come to meet Freddie?

23   A.  I was living in Hartwell, Georgia, and joined a Masonic lodge

24   and Freddie was joining at the same time.

25   Q.  And how long ago would you say approximately-ish?

A.   Thirty-ish.

Q.   Thirty-ish years.  Okay.

And if somebody didn't know Freddie from an alley cat, how would you describe Freddie to that person?

A.   Trustworthy, gregarious, happy, helpful, outgoing.

Q.   Why?  Why do you say those things?

A.   We've heard before, he's always ready to help.  If he doesn't know what to do, he knows somebody that can do or will do.  He's always doing the best he can to help you out to his own detriment on occasion.

Q.   Can you give an example of that?  This would have been before the wreck, correct?

A.   Correct.

Q.   Can you give an example of maybe a time where he helped out when it was to his own detriment?

A.   Well, I'm older and I dear hunt in Georgia and didn't have any help and killed a deer and asked Freddie could he help or do he know somebody?

He said, "Well, I'll come help."  So to his detriment he came out and sweated and got nasty trying to help me drag the deer out but it was interesting.

Q.   Okay.  And when would that have been approximately?  That would have been 2012, 2015, 2009?  Do you have any idea?

A.   Every year until the wreck.  I hunt Georgia.  I still hunted but Freddie -- he'll call somebody to help me or try to -- he

1   can't go down in the woods anymore.  I hunt every year.

2   Q.  And the times before the wreck he would come and help you pull

3   the deer out, did he have any issues getting down to you as far as

4   his right foot?

5   A.  No, sir.

6   Q.  Was that kind of a flat walk?

7   A.  No, sir.  It's just always -- they never die on a flat.  It's

8   always in a gully.  It's always as far down hill as you can get.

9   It's rough terrain.

10  Q.  And any issues with him getting around in that tough terrain?

11  A.  No, sir.

12  Q.  And you said he doesn't do that anymore with you?

13  A.  He can't.

14  Q.  Why not?  What's your understanding why not?

15  A.  After the wreck his ankle's shot.  He can't support the

16  weight -- even his own weight going down or coming back up out of

17  the hill.

18  Q.  Have you seen that foot swell up?

19  A.  Yes.

20  Q.  How often do you see Freddie today or do you speak with him or

21  see him today?

22  A.  We talk frequently.  He comes up to the mountains and visits

23  every couple of months, weather permitting.

24  Q.  What do you-all do when you're up in the mountains?

25  A.  We used to ginseng hunt, trout fish, and knock around the flea

1  markets prior to the wreck.

2  Q.  Do any of those things today?

3  A.  No, sir, we can't.  He can't get up and down the creek banks.

4  Q.  What about the flea market?

5  A.  Can't walk the flea market.  It's just too far from end to end

6  and the terrain's uneven.  Too much of a chance for a slip, trip,

7  or a fall.

8  Q.  Now, up in the mountains would you-all do any kind of things

9  like cutting up wood or carrying wood or anything like that?

10 A.  To his house we would.  We'd carry -- post -- prior to the

11 wreck we could carry wood from my truck up and down his steps, I

12 think, 15, 16 steps up to his porch.

13 Q.  Before the wreck?

14 A.  Before the wreck.

15 Q.  Any issues of him getting up and down those steps with the

16 wood?

17 A.  Not before the wreck.

18 Q.  Describe after the wreck then.

19 A.  I get to carry the wood up the steps.

20 Q.  Have you seen Mr. Cagle without wood walk up those steps?

21 A.  Slowly.

22 Q.  Describe that for the judge since the wreck?

23 A.  He holds onto the guardrail.  He just does it up and down.

24 It's pretty much a guardrail thing and pretty careful about foot

25 placement.

1  Q.  Did he ever have to take a break while going up?

2  A.  He has stopped halfway up.  Especially after he has been up on

3  his foot for a while.

4  Q.  And is it your understanding the reason he has to hold onto

5  the handrail and take those stops is because of his right foot?

6  A.  Correct.  It's a balance thing and it's a strength thing I

7  think.

8  Q.  How would you describe the impact on Freddie that this

9  injury's had on him from your perspective?

10  A.  I think he's severely cut back and I miss my hunting and

11  fishing buddy.  He just can't get out and do what he used to do.

12  He would like to and we would try, but it's too much of a

13  liability.  If he steps off on an uneven spot or steps off in a

14  whole and tears that ankle up again, the liability's just too

15  much.  It's not worth the risk.  It's just -- and it hurts.

16          MR. GOULD:  Those are all the questions I have, Your

17  Honor.

18          THE COURT:  Thank you.  You may step down.

19          THE WITNESS:  Yes, sir.  Thank you.

20          MR. ALEXANDER:  Judge, I'm going to call Mr. Cagle to

21  the stand in just a minute.  But before I do, I want to just go

22  ahead and tender into evidence -- I think Exhibits 1 through 5

23  have been tendered.  I want to tender Exhibit 6, Mr. Cagle's

24  medical records.  The Court has, I think, a digital version of.

25  This is a hard copy version of and --

1          THE COURT:  Very well.  They're admitted.

2          MR. ALEXANDER:  I also have Exhibit 7 which I believe

3  are his medical bills.

4          THE COURT:  It's admitted as well.

5          MR. ALEXANDER:  And those -- Judge, I also noted on the

6  medical bills my office has actually gone through -- these things

7  are kind of crazy to look at -- circled in red the particular

8  events that correspond to the medical records that are being

9  offered.

10          THE COURT:  Very well, thank you.

11          MR. ALEXANDER:  A few more, Judge.  I have Exhibit 8

12  which is the medical bills of Mr. Cagle.  I originally had

13  presented earlier just a one-page of Exhibit 8 which is medical

14  bill summary.  It really wasn't tied to how the medical records in

15  those notebooks are kept.  So there's another format of that

16  medical bill summary that corresponds to the medical records

17  notebook.

18          THE COURT:  It's admitted.

19          MR. ALEXANDER:  And then I would tender Exhibit

20  Number 9.  I think I have to put a sticker on it.  And Exhibit

21  Number 9 is the affidavit of Dr. Johnson with the attachments that

22  include his CV, some of the medical illustration in the CD as

23  well.

24          THE COURT:  It is admitted.

25          Before -- let's take about a ten-minute break and come

1  back and hear his testimony.

2        MR. ALEXANDER:  I think that would last about 45 minutes

3  or so.

4        THE COURT:  That's fine.  We will be in recess.

5        (Recess.)

6        THE COURT:  Be seated.

7        Okay.  You can come on up.

8        MR. CAGLE:  Thank you, Your Honor.

9        THE COURT:  You can bring that water with you if you'd

10  like.

11        MR. CAGLE:  Thank you so much.

12        THE COURT:  Yes, sir.

13                         FREDDIE CAGLE,

14  having been first duly sworn/affirmed and testified as follows:

15        THE COURTROOM DEPUTY:  Thank you.  Please have a seat.

16        THE WITNESS:  Your Honor, my name is Freddie Cagle.

17        THE COURT:  Thank you, sir.

18        MR. ALEXANDER:  I've trained him well.

19                       DIRECT EXAMINATION

20  BY MR. ALEXANDER:

21  Q.  I know we met your wife.

22     Can you tell Judge Story just a little bit about your family?

23  A.  Yes.  That's my wife Debra, my daughter Lindsey.

24     I was born in Royston, Georgia, in Franklin County.  I now

25  live in Hall County.

1     And we've got a home in Braswell City.  That's where I
2   associated with Jon.  We grew up there also.  Not as much now
3   though.  And then --
4   Q.  Let me ask you about this.
5   A.  Yes, sir.
6   Q.  In addition to your daughter that's here, do you also take
7   care of some other folks at your house?
8   A.  Yes.  That's my daughter.  Then I have another daughter.  We
9   got her when she was two weeks old and she's six.  Her birthday is
10  last day of August, August 31st.  And my mama -- my mother lives
11  with us, Judge.  She's 88.  And I've got two more sisters.  She
12  wants to be there with us because my wife is real good to her.
13  Q.  Okay.  The little six-year-old -- now, is -- did you adopt
14  her?  What's the situation with that just briefly, Freddie?
15  A.  That was my brother's daughter's little girl.  Her name is
16  Nevaeh.  That's heaven spelled backwards.  I come in and there's
17  doll laying on the couch.  I went on through the house.  And I
18  went back out the house.  I looked -- that doll moved.  I said
19  what's going on over here?  I didn't think more about it.  That
20  doll was gone.  And Deborah was holding it.  I said what is this?
21  This is -- this is your brother's niece.  She was two weeks old.
22  So we went to the courts and they awarded us her and we've had her
23  all this time.
24  Q.  Is it okay if I call you Freddie?
25          MR. ALEXANDER:  Is it okay with the Court if I refer to

1  him --

2          THE COURT:  Yes, sir.

3          THE WITNESS:  Yes, sir.

4  BY MR. ALEXANDER:

5  Q.  Freddie, your education -- just briefly, what does that look

6  like?  Where did you go to school?  What's your trade?

7  A.  I went Hall County High School 12 years and never missed a

8  day, believe it or not.  And then I went to Wellness School at

9  Athens Tech in Athens, Georgia.  And I welded at Weston House and

10  I moved to Orlando, Florida and welded at the Epcot Center.

11  Welded at Hawkwood (phonetic) and worked at the textile mills and

12  worked at the golf course and I've done about anything I wanted to

13  do.

14  Q.  Now at the time of this wreck, did you have like some

15  properties that you just sort of kept up or is that what you were

16  kind of doing?

17  A.  What now?

18  Q.  At the time that this wreck happened as far as -- were you

19  welding at the time?

20  A.  No, sir.

21  Q.  Okay.

22  A.  No, sir.

23  Q.  What were you doing?  I mean, what were you trying to just

24  keep up?

25  A.  Well, I've got some land and some old trailers and houses,

1  brick houses and homes.  And I tried to maintain all of that.  I
2  do my own plumbing and electrical.  That's the only way you come
3  out if you rent something.

4  Q.  What are you passionate about, Freddie?

5  A.  Well, like Mr. Jerry said, I love going to church.  And like
6  Jon said, I like to deer hunt.  And I've got a pontoon boat I used
7  to just jump up on and go.

8      But now they've built me steps they got me a little chair.
9  They got me a recliner on there and I can sit back and, you know,
10  helping with my youngins and my family.  That's what I enjoy
11  doing.

12  Q.  Freddie, what's the main thing you want Judge Story to know
13  about what you've experienced over these past three-and-a-half
14  years sort of coming on the backside of this wreck?

15  A.  Your Honor, don't ever fight when you get up, sir, and put on
16  your shoes.  If your feet ain't important -- they are.  I just had
17  eye surgery.  And they told me how important your eyes was.  I'm
18  thinking if you all knew what I knew.  When I get up and put my
19  shoes on in the morning, I have to plan my day.

20      In other words, I don't just lace up these New Balance with
21  these implants they give me where I won't fall.  I have to first
22  call and see where I'm going.  And I plan my day through.  You
23  know, I might not plan something if I can't walk up or climb up it
24  or I can't stand up.

25  Q.  So if I want to go with my wife to Greenville and just have a

1  fun time and visit around there and just go without thinking about
2  it, are you able to do that?
3  A.  I would go anywhere.
4      Now, I had neck trouble and all, but as far as me walking --
5  and my legs was the best part of me.
6  Q.  I'm going to talk with you a little bit more about some of
7  your injuries, Freddie.  But I want to go back and talk about the
8  wreck for just five minutes or so?
9  A.  Okay.
10 Q.  Okay.  And I'm going to ask you a couple easy questions to
11 start off with.
12 A.  Okay.
13 Q.  At the time of the wreck, what were you doing?  Where were you
14 going?  What were you in the process of doing?
15 A.  I was at home in my biological -- my Dave's brother's wife.
16 She was going -- she had a doctor's appointment.  The night before
17 we talked and she didn't feel all that good.  I said, "Well, look,
18 why don't you let me come and I will take you to your doctor," up
19 in Jefferson or Kennesaw somewhere up in there.  Anyway, so I went
20 and got her.  I got out of my truck, got in her red Dodge
21 caravan -- good ole van -- and so we head off.
22 Q.  And what road are you all on when you heading off, Freddie?
23 A.  Sir?
24 Q.  What road are you on when you're heading out?
25 A.  We go through Royston and we end up on the interstate.  So I

1  get on the interstate.  I'm going -- I'm going toward Atlanta,

2  south, and we just going along.  And everything is fine.

3  Q.  Is it the morning, evening?

4  A.  It's in the morning.  Nine-ish, 9:30, something like, that

5  10:00 o'clock.

6  Q.  And then tell the judge how this wreck occurs.

7  A.  Well, we were going along and I told Linda -- I said well,

8  Linda, we're early.  I said, that's good because everybody knows

9  about traffic on the interstate.  We can just take our time.

10     So we around there about Commerce, mad for the exit.  I don't

11  know what mile marker, 140 or something, 5, 6, or 7.  We going

12  along.  I see all this traffic.  They line up as far as you can

13  see.  I said, "Well, Linda, we early.  We ain't" -- excuse me,

14  Judge.

15     I said, "Linda, we early.  So this traffic ain't -- maybe it

16  won't put you late for your doctor's appointment."  So I'm on the

17  left-hand side of the interstate, two lanes going south.  And we

18  just at the top of this little hill and we're just kind of began

19  down.  And all of a sudden it sounded like a bomb went off.  I

20  reached -- old habit.  Like, a youngin sitting in the seat.  You

21  know, I looked over her head and I see this truck.  And I said,

22  "Oh, Lord, Linda if I don't move, we" -- so I just cut it left,

23  down the further I went.

24  Q.  What's going through your mind, Freddie?

25  A.  I told her.  I said, "This is bad, Linda.  This ain't good,

1   honey.  Hold on.  We in for the ride.  Just hold on."

2       Down that embankment we went.  And after I took my foot off

3   the accelerator.  And when I did, it went under that brake pedal

4   and we bouncing around.  And I hit my head.

5   Q.  Okay.  Now let me -- Judge, may I approach, please?

6           THE COURT:  You may.

7           MR. ALEXANDER:  I want to show you what's been marked as

8   Plaintiff's Exhibit 10, Mr. Cagle.

9           THE WITNESS:  Is that illegal for me take my shoe off.

10          MR. ALEXANDER:  That's fine.

11          THE WITNESS:  It's not wrong for me to do?

12          I'll take it off.  I've got on clean socks.

13  BY MR. ALEXANDER:

14  Q.  This diagram looks to be generally how this wreck occurred,

15  that was prepared by the trooper in this case?

16  A.  Yes, sir.

17          MR. ALEXANDER:  Judge, I tender Plaintiff's Exhibit

18  Number 12.

19          THE COURT:  It's admitted.

20          THE WITNESS:  Yes, sir, it is, Mark.

21          MR. ALEXANDER:  May I pass it to the Court?

22          THE COURT:  Yes.

23  BY MR. ALEXANDER:

24  Q.  So, Freddie, you're bouncing through the median.  You're

25  ultimately able to get your car to a stop?

1  A.   Yes, sir.  Once I went down in the center of the median, down
2  in the -- you know -- and there's some grass.  I don't exactly now
3  how high it was.  But we went up through there and I was kind of
4  seeing white stuff, you know.  I had bumped my head.  So I finally
5  rolled to a stop and there was a guy while I was there.  I put it
6  in park.  I didn't know I was hung up.  I hit my head and looked
7  at Linda.  I said, "Are you all right?"
8       She said, "Yeah.  Are you?"
9       And I said, "Well, I don't know."  I looked over there to my
10 right and I could just see a mess.  I didn't know -- I said, "Oh,
11 Linda, this is bad?
12 Q.   Were you able -- were you able, Freddie, to just hop out of
13 your car?
14 A.   No, Mark.  What I had to do before I put in park, I just
15 turned it off.
16 Q.   Okay.
17 A.   And I said, Linda -- I just look a look on my head.  I'm hung
18 up.  And so she said, "Freddie, baby."
19      I said, "What?"
20      She said, "This man."
21      I said, "What man?"
22      She said, "This man right here."
23      So I fumbled around and got the window rolled down and this
24 man says, "Sir, are you all right?"
25      I said, "Well, I don't know.  I don't know if I'm all right or

1  not."

2      He said, "Well, you've been in a bad accident."

3      I said, "Well, yeah."

4      And he had a black shirt on, a salesman.  He was going north.

5  And he said, "Well, I'll come around and help you."

6      I said, "Well, sir, I've got to get on home here."  I said, "I

7  think I'll be all right."

8  Q.   Okay.

9  A.   And I thanked him.  I told him that was very nice of him.  And

10 he said, "Well, I can't help the others."  Ambulances and all was

11 coming.

12 Q.   Freddie, at some point in time were you able to get out of the

13 car and just sort of walk around the car to some degree?

14 A.   Yes, I was.

15 Q.   And when you were able to get out of the car, were you still a

16 little dizzy and had some difficulty walking?

17 A.   I did.  Yes, sir.

18 Q.   Were you able when you got out of the car, to kind of look

19 back over at the highway and the road and see some of all these

20 vehicles that were involved in this wreck?

21 A.   I did.

22 Q.   Okay.  Let's see if I can play with this technology a little

23 bit.  Let me show you this.  It's marked as Plaintiff's

24 Exhibit 11.

25     Freddie, can you see that on your screen?

1  A.  I can, Mark.

2  Q.  I don't know.  I'm not the greatest focuser in the world, but

3  I'm not going to mess with it.

4      Is that a picture of the truck that was involved in the wreck?

5  A.  Yes, it is.

6  Q.  Is that the picture of a corner of your red van?

7  A.  Yes, it is.

8          MR. ALEXANDER:  I would tender Plaintiff's Exhibit

9  Number 11.

10          THE COURT:  It's admitted.

11  BY MR. ALEXANDER:

12  Q.  I'm going to show you Plaintiff's Exhibit Number 12.

13      Freddie, is that another picture of the truck you saw that was

14  sort of off in the roadway?

15  A.  Yes, sir, it is.

16          MR. ALEXANDER:  Tender Plaintiff's Exhibit 12.

17          THE COURT:  It's admitted.

18  BY MR. ALEXANDER:

19  Q.  And showing you Plaintiff's Exhibit Number 13.  Is that a

20  picture of the other car that was involved in this wreck as well,

21  Freddie?

22  A.  Yes, sir, it is.

23          MR. ALEXANDER:  Tender Plaintiff's Exhibit Number 13.

24          THE COURT:  It's admitted.

25  / / /

1  BY MR. ALEXANDER:

2  Q.  Freddie, I've blown this up so we can talk a little about it.

3  Exhibit Number 14.

4  A.  Okay.

5  Q.  And is this a picture sort of an overall scene of where this

6  wreck occurred?

7  A.  Yes, sir, Mr. Alexander, that's it.  My God.  That's it.

8  Uh-huh.

9  Q.  Now, is this the overturned car that was shown back in

10  Plaintiff's Exhibit Number 13?

11  A.  Yes, sir.  That's the car that man hit, yes, sir.

12  Q.  And is this the overturned tractor trailer?  I think it's

13  shown in the back of 11?

14  A.  Yes, sir.

15  Q.  At that time, Freddie, is this you here on the corner?

16  A.  That's us right there.  That's where we stopped at.

17  Q.  And all this goes down somewhere in this neighborhood and you

18  kind of go off that way?

19  A.  Well, I was back here, Mr. Alexander.  I was back here, Mark.

20  And naturally, common sense tells you get out of the way.  Don't

21  just let him kill.  I mean, you know what I'm saying?

22  Q.  When this bomb went off next to you and all this debris is

23  blowing up all over the place, did some of that stuff hit some

24  portion of your van?

25  A.  That was the first time my wife -- my aunt said, "Something

 1  has hit our van."

 2      "At least it wasn't that semitruck, Linda.  We can fix your

 3  van maybe."  I don't know what hit it.  Some of that stuff I

 4  guess.

 5          MR. ALEXANDER:  Your Honor, I tender Plaintiff's

 6  Exhibit 14.  I have regular sized copy of it.

 7          THE COURT:  It's admitted.

 8  BY MR. ALEXANDER:

 9  Q.  I've got two more of these pictures I want to go through,

10  Mr. Cagle?

11  A.  Okay.

12  Q.  Can you see Plaintiff's Exhibit Number 15, there?

13  A.  Yes, sir.

14  Q.  Is that another picture of the truck?

15  A.  Yes, sir, it is.

16  Q.  And Plaintiff's Exhibit Number 16, is that another picture of

17  the car that was involved in this wreck?

18  A.  It is, yes, sir.

19  Q.  Okay.

20          MR. ALEXANDER:  I tender Plaintiff's Exhibits 15 and 16,

21  Judge.

22          THE COURT:  They're admitted.

23  BY MR. ALEXANDER:

24  Q.  Mr. Cagle, do you see Plaintiff's Exhibit Number 17?

25  A.  Yes, sir, I do.

1  Q.  Is that a picture of your red van and you sort of standing
2  next to it where that van came to a rest after this wreck
3  occurred?
4  A.  Yes, sir, it is.
5       MR. ALEXANDER:  I would tender Plaintiff's Exhibit
6  Number 17, Judge.
7       THE COURT:  It's admitted.
8  BY MR. ALEXANDER:
9  Q.  Now, Mr. Cagle, does it sort of show -- so you are way back
10 here and you kind of go through the woods -- not the woods but the
11 grass and kind of come up.  Does that kind of show generally how
12 you came off of the roadway and where you wound up?
13 A.  Yes, sir.  That's where I finally put it in park right there.
14 Q.  Okay.  Okay.  Now, you see the State Patrol?
15 A.  That's Officer Cummings, a very, very, very nice man.
16 Q.  Did Officer Cummings asked you if you needed an ambulance to
17 go to the hospital?
18 A.  He did.  The reason he running, he come told us just to hold
19 on, the ambulance would be back.  He done sent one ambulance, to
20 the best of my knowledge, and he running to the other -- you know,
21 there was more people.  So he was running to them.  I mean, that's
22 him running off.  Yes, sir.
23 Q.  Did you -- did you ultimately leave the scene in an ambulance?
24 A.  No, I did not leave in an ambulance.
25 Q.  How was it that you actually left from where you are in

1  Exhibit in Number 17, just briefly, Freddie?

2  A.   How did I leave?

3  Q.   How did you leave?  How did that come about?

4  A.   Officer Cummings comes back over there and he says, "Wait on

5  this ambulance."

6       And I said, "Okay."

7       And he said, "Let me look at your head."

8       Well, I said, "I just hit the glass on the side of the door.

9  But I said, boy, it like to knock me out."

10      He said, "Well, just hold on.  There will be an ambulance."

11 So he actually left again.  He didn't stay gone long.  He come

12 right back.

13      He said, "There's two ambulances left."  It was him and a

14 police lady from Banks County.

15      And I asked him -- I says -- we just kept waiting and kept

16 waiting and kept waiting.  So I sat down at the right front tire

17 of Linda's van.  So I sat down and finally, after a short period

18 of time, I said, "Well, we need to go to her doctor's visit.

19 She's got a doctor's appointment."

20      And he said, "Well, you need to go to the hospital."

21 Q.   Okay.

22 A.   And he said, "When you go to the hospital -- if I let you-all

23 leave, will you go to the hospital?"

24      I said, "Well, give me just a -- we'll get in the van."

25      He said, "You stay here as long as you want to.  You get in

1 the van." So that's what I did.

2 Q. Were you still able to drive the van?

3 A. I got into the van and we hooked up. And I went a long way so

4 I could find out how to get back up on the highway. Yes, sir, I

5 did drive the van out of there. Yes, sir.

6 Q. Did you go -- did you go to Linda's doctor appointment

7 somewhere in Jefferson or somewhere further south on 85?

8 A. Yes, sir, I did. I took Linda onto her doctor's appointment.

9 And I pulled up and Linda got out and went in. And I actually

10 opened the door and I said, "I've got to figure out what's wrong

11 with me." I said, "Something's wrong."

12 Q. Okay. When you get to Linda and you take her to the doctor's

13 appointment, do you go into the doctor's office with Linda?

14 A. No, I did not.

15 Q. Okay. What do you do?

16 A. I sit in the van and I'm sitting there and I said, "Man, I got

17 a headache." And what really hurt me all over, when -- I worried

18 about my back and more or less I worried about everything. I knew

19 something wasn't right. So I just decided I could see in the

20 doctor's office. I could see Linda coming. She was walking and

21 she was fine. I said I'm going to let her drive.

22 Q. Okay.

23 A. So I get out and go on the passenger side.

24 Q. I wanted to jump out of this for just a second, Freddie, and

25 talk about maybe about two weeks before this wreck. I think, the

1  judge has the medical records show -- the judge has the medical
2  records -- some time in July, maybe July 28th -- I'm sorry.
3  June 28th.  June 28th did you have -- did Dr. Grunch do some sort
4  of procedure for your back?
5  A.  Yes, sir, I did.
6  Q.  Okay.  Briefly -- just really, really brief, just tell the
7  judge what was going on?  What she did there?
8  A.  Judge, Your Honor, I had a spinal cavity which is very rare.
9  Ain't many people has it.  They put two titanium rods and 12
10 screws in my body in Augusta, Georgia.  Dr. Choudhri did it in
11 Augusta.
12    Apparently, God didn't want no titanium in me because the
13 swelling would never go down.  So I went several years suffering
14 in pain.  And I found Dr. Grunch out here in at Northeast Georgia
15 Medical College and I come and saw her.  And she says, "I'll take
16 those things out just as fast as he put them in."
17    And I went and seen my daughter.  And every doctor I been to
18 and she was five stars and had good reports about her.  She is a
19 good neurosurgeon.  She is -- you-all have a very good doctor out
20 here if you need her.
21 Q.  What did she -- she took the stuff out of your back?
22 A.  She took it out and glued me back up.
23 Q.  Okay.  Now, that's a couple weeks before.  After she does that
24 a couple weeks before, does she schedule you an appointment to
25 come back into her office --

1   **A.**   Yes, sir.

2   **Q.**   -- a little bit later on?

3   **A.**   Yes, sir, she does.

4   **Q.**   And is that scheduled appointment -- is that actually after

5   this wreck takes place?

6   **A.**   After the wreck took place.

7   **Q.**   Okay.  And we're going to get to that.  I will get to that.

8   **A.**   Okay.

9   **Q.**   Now jumping back, you're at Linda's doctor's office.  Linda

10  hops into the driver's side of the van.  You are in the passenger

11  side of the van briefly.  Where did you-all go?

12  **A.**   I told Linda, I said, "Linda, I think Officer Cummings right.

13  You better take me straight to the hospital."  Because I didn't --

14  I didn't feel good.  I knew something was wrong.  I knew what it

15  was.

16      So she said, "Well, where do you want to go?"

17      Normally I would have went to Athens.  But we have an Athens

18  up on the interstate.  There's a hospital there -- up there and

19  Piedmont Regional owns it now.  Okay.  I thought it would be

20  better on us if I could just go there and have an MRI done.

21  **Q.**   Okay.  Did you go to the hospital and emergency room later the

22  same afternoon that this wreck happens?

23  **A.**   We drove straight from her doctor's office to the ER.

24  **Q.**   Okay.  And after they looked at you and do whatever they do at

25  the ER, do they let you go home?

A.   Yes, sir.

Q.   Okay.  And when you go home, does your foot just kind of start to get better?

A.   No, sir.

Q.   What's going on with it?

A.   It started swelling.  And when it started turning colors is when I got worried about it.  I knew something was wrong.

Q.   Did you -- did you go to your doctor's appointment with Dr. Grunch like it was regularly scheduled?

A.   Yes, sir, besides then I did.

Q.   And when you went to see Dr. Grunch to talk about your back, did you also talk about what's going on with your foot?

A.   I told Dr. Grunch if -- she's a real friendly, outgoing type person, easy to get along with.  I said, "Dr. Grunch, I been in an accident up on the interstate.  And I been hit from my head down to my feet.  But I'm worried about my back.  Did it knock any of the setup you done?"

She looked and said, "No."

I pulled off my sock.  I said, "Look at my -- look at my foot."

She said, "I can tell you now you need to go to" -- I can't think of the proper name for a foot doctor.

MR. ALEXANDER:  A podiatrist.

THE WITNESS:  I come home and my wife had had her foot operated on in Athens with a Dr. Rossi.

1   BY MR. ALEXANDER:

2   Q.   Okay.  Now do you -- okay.  So do you leave Dr. Grunch -- does

3   Dr. Grunch tell you you need to go see somebody; look at that

4   foot?

5   A.   Dr. Grunch told me to go to a foot doctor.  I thought it was

6   just broke.  I thought it was just broke up and it would finally

7   get okay.

8   Q.   Okay.  Do you go see -- after you leave Dr. Grunch's office,

9   do you go see doctors and they do imaging and MRIs and all this

10  different stuff of your foot?

11  A.   Yes, sir.  Before I left, I took -- I took my disk from the

12  hospital.  I took all the medical history I had and I got my wife

13  to call Dr. Rossi.

14  Q.   Why did you go see Dr. Rossi?

15  A.   Dr. Rossi's in Athens.  He's the medical doctor for Bulldogs

16  basketball, soccer, anything to do with UGA.  He's a foot doctor.

17  I thought I was in very good hands.  Just like this is a good

18  judge.  I feel like I'm in good hands.

19       I go out there.  Dr. Rossi looks at that.  "No.  No.  Uh-uh I

20  can't touch this."

21       I thought, What?  I said, "Doc, all the football players get

22  hurt."

23       He said something about a tendon.  I didn't know nothing about

24  no tendon.  Then I had to start over.  I had to start my journey

25  over again.

1  **Q.** Did Dr. Rossi suggest you go get a second opinion and try to
2  find somebody else that might be able to fix it?
3  **A.** Dr. Rossi took images.  I asked if I could have that disk.  He
4  said I could.
5  **Q.** Did he get you to see ultimately Dr. Lu.  Does that sound
6  about right?
7  **A.** Yes, sir, that is -- yes, sir, Dr. Lu.
8  **Q.** And when you go see Dr. Lu and you take all these disks and
9  all these images and all this stuff with you, what's Dr. Lu
10  telling you he needs to do for you?
11  **A.** Dr. Lu -- when I went in his office, about two miles there on
12  the left.  He's a very nice man.  He put that disk in his
13  computer -- and you got two ringers in your foot.  I didn't know
14  that.  One of mine looked like it's been chopped up.  I knew I was
15  in trouble.  He would hold my foot up.  It would fall over.
16  He said, "Try to hold your foot up."
17  I said, "Doc, what do you mean try?  I am trying."  It falls.
18  It was -- anyway, he goes through all of this and tells me what he
19  thinks he would do.
20  **Q.** And what's that?
21  **A.** He do surgery on my foot.
22  **Q.** Okay.
23  **A.** So what I do is go to my daughter.  And I said, "Lindsey" --
24  by then my foot's done -- it's done got -- I had to do something.
25  So Lindsey looks him up.  And he's a five star and he's good.

1  Q.  All right.

2  A.  So I go back to Dr. Lu, Your Honor, and he draws with an ink

3  pen what he going to do.  He said I'm going to take one of these

4  tendons out.

5  Q.  Freddie, you don't need to go through all the surgical

6  procedures that Dr. Lu did.

7  A.  Okay.  That's fine.

8  Q.  The judge has all of that in the medical records.

9  A.  I thought he might know that.  I didn't know.

10  Q.  Did you go through and have surgery with door Dr. Lu?

11  A.  I went to Dr. Lu and I had surgery.

12  Q.  I show in the records that's sometime in about October which

13  is a handful of months after this wreck.  Does that sound about

14  right to you?

15  A.  Yes, it does.

16  Q.  Now I want to show you what I've marked as Plaintiff's Exhibit

17  Number 18.  Freddie, is that a picture of your foot after the

18  surgery with Dr. Lu?

19  A.  That's it.  Unfortunately, that's it.

20          MR. ALEXANDER:  I tender Plaintiff's Exhibit 18.

21          THE COURT:  It's admitted.

22  BY MR. ALEXANDER:

23  Q.  Now, Freddie, after you go see Dr. Lu, eventually, do you go

24  home and do all the things he tells you to do?

25  A.  Yes, sir, I do.

1  Q.  Do you follow-up and go to A couple visits with Dr. Lu after

2  this surgery with Dr. Lu?

3  A.  I went to several visits with Dr. Lu.

4  Q.  And when you're going to see Dr. Lu are things progressing

5  well?  Are you getting better or what's going on with your foot?

6  A.  No, sir, it would never -- it just would never get better.  It

7  stayed kind of discolored, you know, and red and I had -- I was

8  just hoping.  Well, he done surgery.  He knows what he doing.

9  It's going to get better.

10 Q.  Did you try physical therapy and do all kinds of stuff with

11 bands and stuff like that?

12 A.  I did.  I could have done it in-house but, Mr. Alexander,

13 you've got to realize, Covid was going on.

14 Q.  All right.

15 A.  And he wanted me to get rubber bands and role of dice.  I knew

16 what to do with the dice with my toe.  The rubber band -- they

17 showed me what to do and I done it at home.

18 Q.  Did it help?

19 A.  Well, I tried.  I was ordered to do it and I done it.

20 Q.  Did your foot get better?

21 A.  No, sir.

22 Q.  Did you go see Dr. Lu finally at the end and say Dr. Lu,

23 what's going on with my foot?  My foot ain't getting better.  What

24 are we doing had a here?

25 A.  I did.

1  Q.  What did he say?

2  A.  I went to see him.  He was just apologetic.  Hi was serious.

3  It was no joking matter.  He was real -- he wanted to fix my foot.

4      He said, "Now, look, I'm going to tell you something,

5  Mr. Cagle."  He said, "This is your life.  It's your foot.  You've

6  got to walk on it not me."  He said, "If you want to go somewhere

7  else, you can."

8  Q.  Okay.

9  A.  And I said, "I don't want to stay here on the bus, Dr. Lu."

10     He said, "You ain't throwing me under the bus.  If you want to

11 go somewhere else, you go."

12          I said, "The swelling -- it aches all the time."

13          He said, "Well, let's put you in a boot."  So he did and

14 I wore that.  And I go back.  The same thing.

15 Q.  Ultimately did you go see somebody other than Dr. Lu -- after

16 Dr. Lu to try to get some help with your foot?

17 A.  I did.

18 Q.  Is that Dr. Johnson?

19 A.  That's Dr. Joseph Johnson in Athens, Georgia.

20 Q.  Now when you go see Dr. Johnson -- and Judge Story has seen

21 the testimony of Dr. Johnson.  He's seen the affidavit and medical

22 records.  He knows what Dr. Johnson does for you.  Okay.

23     When you go see Dr. Johnson, is your foot in excruciating

24 pain?

25 A.  Yes, sir, my foot's in pain.

1  Q.  And when you go see Dr. Johnson, and you talk about what he's

2  going to do for your foot, does Dr. Johnson tell you, well, that's

3  fine; I'm going to be able to help you out; I will make this thing

4  as good as new?

5  A.  No, sir.  His exact words Dr. Joe Johnson told me, he said, "I

6  can go in there and I can try to restructure your foot."  He said,

7  "You only have one tendon left."  He said, "Dr. Lu" -- I mean, I

8  guess -- now, the medical records may show something different,

9  Mr. Alexander.  From what Dr. Johnson told me, it's worth trying.

10 Q.  Okay.

11 A.  And I had to do something because I was afraid I was going to

12 lose my foot.

13 Q.  Do you undergo that surgery with Dr. Johnson?

14 A.  I went to Dr. Johnson and he did -- he did the very best he

15 could do.  Very fine doctor.

16 Q.  Okay.  When you get done -- now this is the second surgery you

17 had on your foot?

18 A.  Right.

19 Q.  The first surgery you had with Dr. Johnson.  When you get done

20 with that surgery, you get to go back home?

21 A.  I did.

22 Q.  Okay.  How is your foot doing?  Is it getting better, healing

23 up like it's supposed to and everything's going to be okay?

24 A.  No.  Well, I tell you -- I said, well, I might as well stay

25 off my foot.  It might get better.  I've got to walk on these

1  feet.  I realized right quick how important your feet was.  So I
2  kind of babied my foot more.  Normally I wouldn't do that.

3       Somebody come and say, "Freddie, let's go fishing.  Let's go
4  down here."

5       I'd say, "No, I think I'm going to stay home."  I had to keep
6  it elevated.  I kept ice on it all the time because I done been --
7  and Dr. Johnson was a five-star, excellent doctor.

8       Well, I can't get no more stars.  So I've got to get my foot
9  better.  I can't get it wet.  I can't let nothing drop on it.  And
10 I know why they make steel-toed shoes.  I know why now.

11 Q.  People see it and comment on it, Freddie, why are you sitting
12 up at home?

13 A.  Yes.  That's what made me go back.

14 Q.  Talk to the judge about that.  Tell him briefly.

15 A.  Your Honor, people would come see me.  I have a lot of
16 friends, a lot of company.  And they'd say, boy, you better get
17 your foot fixed.  So when Pastor Jerry and Chairman Deacon -- he's
18 dead now -- with Greg K -- and Greg was aggravating to me but I
19 loved him.  He said, "Boy, you gone lose your foot."  He said,
20 "Let me get on my smartphone and call Joe Johnson."  Well he
21 couldn't get ahold of him.  He called Friday -- Thursday, Friday,
22 Saturday, and Sunday.  So Greg called my daughter while he was
23 there.  My daughter lived next door.

24      Greg knew if he got with Lindsey, Lindsey would make me do
25 something.  They looked at it and it looked terrible.  So that

1  Monday morning we got ahold of Dr. Johnson.  And I think now, I
2  let me daughter do the talking.  I might want to say something
3  that ain't right.  I think Lindsey had took some pictures of it.
4  I think.  I'm not sure.  But, anyway, I knew I was in trouble.  I
5  said they going to have to take my foot off.
6  Q.  All right.  Freddie, when these people would come to your
7  house or visit you and they would see your foot, what would they
8  say?  What would they say?
9  A.  They say, boy, you going to lose your foot.  They just said if
10  you don't want to do something.  And, you know, I put peroxide and
11  I'd put that ace bandage and I tried -- and I'd elevate it and put
12  ice on it.  To me that irritated it more.  I tried everything I
13  could.
14  Q.  Mr. Cagle, let me show you Plaintiff's Exhibit Number 19.
15  A.  That's it.
16  Q.  Is that a picture of your foot --
17  A.  That's it.
18  Q.  -- after the first surgery with Dr. Johnson?
19  A.  That's it.  Unfortunately that's it, Mark.
20          MR. ALEXANDER:  Tender Plaintiff's Exhibit 19.
21          THE COURT:  It's admitted.
22  BY MR. ALEXANDER:
23  Q.  Freddie, did you go back and see Dr. Johnson when your foot's
24  all red and pussy and gross or whatever it is, what happens?
25  A.  That's the picture right there.  When he answered the phone --

1  he had a nurse named Caitlan (phonetic), Your Honor.  She is a
2  very nice lady and very smart.  I said, "Caitlan, I'm in trouble."
3      She said, "I tell you what you do, Mr. Cagle, you come on out
4  here."  So we got in the car, I think me and my wife.  We go
5  straight to Dr. Johnson's office.  Well, he is on the right.  His
6  P.A.'s on the left.  It may have been who I seen when I got in
7  there.
8      And when I went in there, Caitlan and the P.A. looked at it,
9  they said we'll be right back.  They went and got Dr. Johnson.  He
10 come in and he said, "Caitlan, no more appointments for me today."
11 I don't what time it was, Your Honor, 9:00 or 10:00 o'clock.  I
12 don't know.
13     He said, "Call up to the hospital.  He's got to go to the ER.
14 He ain't got to go -- they don't have to admit this.  Go."
15     And I said, "Well, am I going to be all right?"  Well, he
16 didn't answer me.  He said, "Go."
17     So we went straight to the hospital in the back -- a place I
18 never been at -- in Athens Regional.  We went in the back and they
19 had the door waiting on me.  So I go in there and they put me on a
20 table and go through all this.  And I'm in the operating room and
21 I'm thinking -- by that time Dr. Johnson walked in all suited up
22 and had his tools all ready to go.
23 Q.  Now Freddie --
24 A.  Go ahead.
25 Q.  -- you go in there and go to the emergency room and they tell

1  you what's doing on or -- to the hospital --

2  **A.**  Yes.

3  **Q.**  -- what's going through your mind?  What are you thinking?

4  **A.**  When he comes in there, when he went to tell me all of this, I

5  says, "Dr. Johnson, wait a minute."

6      He say, "You need to call your wife?"

7      I said, "I sure don't.  I need to call Jerry Durham.  This

8  ain't good."  He doesn't know Jerry, probably -- Dr. Johnson

9  didn't.

10     I called Jerry.  It wasn't unusual for me to call Jerry.  It

11 wasn't unusual for him to see my name on his phone.  I said,

12 "Jerry, bow down this time.  Pray hard because I'm in trouble."

13     And he said, "I always do, Freddie.  I will."

14 **Q.**  What were you worried about, Freddie?

15 **A.**  I worried about -- I figured I wouldn't have no foot.  I

16 thought that they were going to cut it off.  I looked for some

17 saws.  I didn't see none.  I said, "They going to cut my foot

18 off," but they didn't.

19     Dr. Johnson tried to explain it to me.  By that time they done

20 had me good and juiced up, Your Honor.  I laid back and I was

21 trying to make it, trying to survive.

22 **Q.**  And then after the surgery with Dr. Johnson, are you laid up

23 in the hospital for a handful of days?

24 **A.**  Yes, sir, I am.

25 **Q.**  And when you're in the hospital for a week or so, they're

1  trying to get this infection under control?

2  **A.**  Yeah.  But it didn't work, Mark.

3  **Q.**  Do you remember who you were seeing and they were trying to

4  help you with that infection?

5  **A.**  Dr. Johnson said the infection doctor over Athens Regional.

6  His name's Dr. Visitacion.  He looked -- he's a little short

7  fellow.  A real nice man.

8      He come in and said -- when they draw blood, Your Honor, it

9  shows how much infection you have.  And my level was extremely

10 high.  So he said, "I'm an infection disease doctor."

11     I said, "Dr. Visitacion, how am I going to get this out of

12 me?"

13     He said, "Well, we're going to start giving you liquid drips

14 right now."

15     I said, "Okay.  That would be fine."  That's what they did for

16 the infection at this point.

17 **Q.**  That's why you're in the hospital?

18 **A.**  What?

19 **Q.**  That's why you're in the hospital?

20 **A.**  That's why I was in the hospital.

21 **Q.**  Then what happens?  What do you remember most about being in

22 the hospital and this infectious -- and stuff going on, Freddie?

23 **A.**  Dr. Visitacion kept coming in.  It wouldn't get better.  So

24 Covid's going wild and everybody's masked up and hooded up.  So I

25 didn't know what was going to happen.  So Dr. Visitacion said,

1  "Have you ever had a port?"

2      "I don't know what you're talking about, Doc."

3      He said, "Well, we'll take you downstairs.  Just do a little

4  procedure, put a port in."  He didn't explain about no port.

5      He said, "And we'll send you home.  You'll have to buy this

6  infection medicine from me."

7      I said, "That's fine.  I got to get better or lose my foot."

8      He said, "Yeah.  If you don't -- if you don't take -- but you

9  can't stay in this hospital because of Covid.

10     I said, "That's fine."  I'm fine the because IV would be -- I

11 didn't think nothing about it.

12 Q.  What happened?

13 A.  Then, they come get me.  And, Your Honor, I didn't come in

14 here to be comical and I don't want to make you laugh, but I'm

15 going to tell you something.  If you got family members and they

16 say they going to get a port.  You go be with them.  Because this

17 is just something that I wish every hospital would provide

18 something where they have to put you to sleep to put a port in.

19 What they do, Judge, they come right here.  Right here.  But they

20 will roll you down there and -- can I get one of these napkins?

21 They roll you down here and they put a port in.  You-all you look

22 over here.  You don't see them over here.  It takes them forever.

23 There was two or three.  There was one man, a very nice boy, two

24 women and they was were just -- I laid there forever.

25     He said, "Well, when I get off this thing, I've got new a

1  converter.  I'm going to cut grass."

2      She said, "I'm going to get my nails done."  I'm laying there.
3  I be good.

4      This other girl said, "Well, I'm going to" -- and she stopped.
5  Your Honor, you know, what a nail gun is, like you build 2 x 4s on
6  the roof with?  They hit me right here and I went up and I said,
7  "Well, they shot me.  They have hurt me," you know, and I was mad.

8      And, Brother Jerry, I said a bad word.  I know you're proud of
9  me because I would have never said a bad word.  They hurt me bad.
10 It makes me nervous when I talk about it.  But that line runs from
11 this shoulder down here to your heart.  How they do that, Your
12 Honor, I don't know.

13 Q.  Okay.

14 A.  So they put in an IV, Mark.

15 Q.  Okay.  Now do you get to go home?  I want to just kind of move
16 out of the hospital now.  The judge has got all the medical
17 records.  He can see it.  I want to talk -- kind of wrap this up,
18 Freddie, about what it's like at home.

19 A.  Okay.

20 Q.  Okay.  When you get home, what's going on as it relates to
21 what you've got to do and --

22 A.  Dr. Visitacion -- Dr. Visitacion was real helpful.  He
23 called -- he called Tugaloo Home Health.  They were extremely
24 nice, all of them were.

25     Well, my daughter, she works for Piedmont Athens Regional.  I

1  wanted her to be a nurse.  She thought otherwise.  Now she works
2  from -- at home for the hospital.  So I counted on Lindsey.  I
3  said, "Lindsey, you need to come out here or come in my house and
4  let home health go.  Your daddy don't know all of this
5  contraption."  You should have seen all this mess.

6      I was in my bedroom and my bathroom's just adjacent right
7  here.  So you had to just lay there.  And I had this pole, this
8  fluid and it just drip, drip, drip.

9      Now I love to watch *Andy Griffin* and *Gunsmoke*.  But you can
10 just watch so many episodes and you just get tired.  Drip, drip.
11 And my daughter would come up.  I forget how many bags -- two or
12 three bags a day --

13 Q.  Okay.

14 A.  -- I have to take.  It will make you so sick.

15 Q.  What do you mean, "make you so sick"?

16 A.  Sick, Mark.  I can't describe it.  It makes you so sick you
17 hate your own mama.  And I don't hate nobody.  But that stuff
18 would upset your stomach.  It makes your mind wonder.  Now, I'm
19 not talking about --

20 Q.  Now, Freddie --

21 A.  It didn't make me mean or nothing.  It wouldn't make me say
22 something to my family.  It just made me uncomfortable.

23 Q.  Freddie, when it upset your stomach, when you'd go to -- you'd
24 go to the bathroom, would you be wheeling this thing in with you?
25 Did you have to have help?  What did all that look like?

1  **A.** Well, I'm old school, Mark.  If you can imagine Fred Sanford
2  stumbling around, him and Lamont.  Me and that pole and that
3  bag -- and I would holler.  They would holler, "Fred!"
4      "I'm all right."  I would fall and couldn't walk.  And all the
5  hoses and lines hooked up to me but it was to my benefit --
6  **Q.** Okay.
7  **A.** -- to take that infection medicine or lose my foot.
8  **Q.** Did the infection -- did the infection -- Freddie, after you
9  took that medicine, did the infection eventually start to clear
10 up?
11 **A.** The home health people would come draw blood.
12 **Q.** Did you have any difficulty with that?
13 **A.** Sir?
14 **Q.** Did they have any difficulty getting that blood?
15 **A.** Well, I got thick blood.  It's hard to get an IV in me.  And
16 then during all this time that port stops up.
17     Well, Your Honor, my nerves went out.  It just went out on me.
18 I said, "They're not shooting me no more.  I'm going to see to
19 that."
20     So Lindsey and the home health nurse, they work with that
21 thing -- worked with that thing.  So they sent me back,
22 Mr. Alexander, they sent me back to Dr. Visitacion's office and
23 they worked with that port and they worked with it.
24 **Q.** Okay.
25 **A.** And flushed it and finally got it unstopped.  Then it would

1  get -- then after my -- my daughter can tell you, after so many

2  weeks, it would do it again.

3  Q.  Freddie, the Judge got all that.

4  A.  Okay.

5  Q.  Okay.  I want to talk about your foot and this infection and

6  you take these liquid IVs however many times a day, two or three

7  times a day, for two or three months, however long it is.

8      Now, after you do this, does the infection in your foot start

9  to get better?

10 A.  Yes, as time went on.

11 Q.  Okay.

12 A.  At the end it started to get better.

13 Q.  And as the infection gets better, do you go follow-up with

14 Dr. Johnson?

15 A.  I do.

16 Q.  Okay.  And does Dr. Johnson give you something to try to help

17 with the stability of your foot?

18 A.  Well, at first he -- you know, I was already in a boot.  Of

19 course he give me one, too.  I get another boot.  So I kept going

20 back but it just wouldn't get better.

21     So I went in there and he says, "Now, Mr. Cagle, I've been

22 fighting about something."

23     I said, "What's that, Doc?"

24     He said, "I've got a friend of mine over in Athens -- a

25 brace."  I don't know nothing about the place.  It's probably in

1  my records.

2      I said, "A brace?"  Because I would be just standing and I

3  would fall.

4  Q.  Okay.

5  A.  I'd just fall over like a drunk.  Bloop -- fall over.

6      Me and my wife we went to get some barbecue and it had been

7  raining.  Thank God the grass was soft.  We come home in the van

8  and I got out.  I just fell.  Of course, two or three cars come up

9  the road with me laying on the ground.

10 Q.  What did Dr. Johnson do for you, Freddie?

11 A.  He sent me to this brace place.  And I bought these braces.

12 They in my shoes right now.

13 Q.  All right.

14 A.  If I did not have them, I could not stand up.

15 Q.  Freddie --

16 A.  Yes, sir.

17 Q.  -- do you have feeling in your foot?

18 A.  Do I have feeling?

19 Q.  Feeling in your whole foot, all your toes?

20 A.  No, sir.  The two little toes, there's no feeling.  And the

21 third one up, it's -- they said it had a high feeling.  I don't

22 know.  But my foot's numb and hurting right now.  As I speak it's

23 hurting.

24 Q.  And I've got the last time you saw Dr. Johnson was maybe

25 February of 2021.  Almost two years ago or so.  Does that sound

1    about right to you?

2    A.   That's probably correct, Mark.

3    Q.   Since that time, Freddie -- since that time, have you had

4    difficulties with your foot?

5    A.   Yes.   I had difficulty putting my socks on this morning but

6    you just have to work through it.   You have to just go on and go.

7    Q.   Let me show you a couple pictures, Freddie?

8    A.   Okay.

9    Q.   Showing you a picture, Plaintiff's Exhibit Number 20.   My

10   notes show that was a picture somebody took of your foot back

11   about May of 2021.

12   A.   That's my foot.   Yes, it is.

13   Q.   And is this another -- Exhibit Number 21, is that another

14   picture of your foot --

15   A.   Yes, sir.

16   Q.   -- in May of 2021?

17   A.   Yes, sir, it is.

18        MR. ALEXANDER:   I tender Plaintiff's Exhibits 20 and 21,

19   Judge.

20        THE COURT:   They're admitted.

21   BY MR. ALEXANDER:

22   Q.   Freddie, if you're still having problems with your foot, why

23   didn't you go back to see Dr. Johnson?

24   A.   Well, Mr. Alexander, I'm going to tell you something.   I

25   prayed about it and I weighed my odds.   I ain't got but one tendon

1  left in that foot.  You've got two.  So if I stay off of it, and I
2  watch what I'm doing, keep ice on it -- and at times, it's going
3  to look like them pictures right there.  And I have to just stop
4  whatever I'm doing.  And I go lay down, elevate it, and get it
5  back down.

6  Q.  Did you go back to Dr. Johnson?

7  A.  I did not want to go back because they wouldn't -- in my mind
8  there wasn't nothing else he can do.  So I just said this is the
9  hand I got dealt and that's what I'm going to live with.

10     Maybe that's the wrong sign.  But me and Dr. Johnson are still
11 on good terms.  I could go see him if he give me an appointment
12 with him tomorrow, if I want to.

13     But, Your Honor, I'm not going back when they -- when two
14 five-star surgeons done all they can do for you.  At least I can
15 walk and I'm not paralyzed, you know.  At least I can go but it's
16 hard.

17 Q.  Freddie, let me ask you a couple easy questions.  Okay.

18     Have you had pain in your foot and has the pain in your foot
19 been continuous from the time of this wreck until today?

20 A.  Yeah.  It ain't got better, Mark.

21 Q.  Did the pain get really, really bad around the time of these
22 three surgeries?

23 A.  It did.

24 Q.  And do you attribute all of the pain that you've experienced
25 in your foot to the injuries that you received from this wreck?

1  A.  Yes, sir, I do.

2  Q.  Freddie, have you given any thought -- how old is your mom?

3  A.  Well --

4  Q.  How old are you, Freddie?

5  A.  Sir?

6  Q.  How old are you?

7  A.  I am 62.

8  Q.  How old is your mom?

9  A.  How old's what?

10  Q.  How old is your mother?

11  A.  She's 88.

12  Q.  Okay.  Have you given any thought to what it's going to be

13  like when you're 70, 75, 80 years old?

14  A.  Well, can I talk to the Judge?

15      Your Honor, they'd have to move these wires.  These wires hurt

16  me.  I can't touch my foot on nothing.

17      But I'm just saying, Mark, as I get older it's probably --

18  see, right now I'm able to move around.  But when I get 88 like my

19  mama, I may not be able to move my foot like I want to.  So, yeah,

20  I've given it a lot of thought, Mark.

21  Q.  You have thought about it?

22  A.  Have I thought about it?

23  Q.  Yes, sir.

24  A.  I think about it every day.

25  Q.  All right.

1  A.   I'm going to have to live with -- you know, I've got to live.

2          MR. ALEXANDER:  That's all the questions I have at this

3  time, Mr. Cagle.

4          THE COURT:  Thank you.  You may step down, sir.  Take

5  your time.

6          THE WITNESS:  Thank you, Your Honor.  Thank you very

7  much.

8          MR. ELLIS:  Your Honor, plaintiff calls their final

9  damages witness, Ms. Lindsey Crowder, the daughter of Freddie

10  Cagle.

11                        LINDSEY CRIDER,

12  having been first duly sworn/affirmed and testified as follows:

13          THE COURTROOM DEPUTY:  Thank you, please have a seat.

14                      DIRECT EXAMINATION

15  BY MR. ELLIS:

16  Q.   Good morning.

17  A.   Good morning.

18  Q.   Will you please just introduce yourself to the Judge by kind

19  of telling him a little about yourself and background and kind of

20  what you do?

21  A.   My name is Lindsey Crider.  Oh, C-r-i-d-e-r.

22      From 2012 to 2013-ish, I was a medical assistant for a primary

23  care doctor.  And then in 2013 I started at Athens Regional in the

24  billing department and I've been with them ever since Piedmont

25  took over and everything.

1  Q.  Can you tell me a little bit about your family.  Are you
2  married?
3  A.  I am.  I got married, let's see, in 2011.  And then my husband
4  got injured in 2012.  He had two disks ruptured and he's got
5  permanent leg damage in his right leg.  So he is disabled.
6  Q.  Any children?
7  A.  We have one, he is five.  He was born in 2017 and is a boy.
8  Q.  I want to talk about your dad.
9  A.  Okay.
10  Q.  Before the wreck, as you're growing up and as you become an
11  adult, who is your dad to you?
12  A.  He is the person that I count on the most.  I know when you
13  get married you're supposed to cleave to your spouse, but
14  sometimes my daddy is my number one on my speed dial.
15  Q.  Why?  Why is he your number one?
16  A.  Because he took care of me my entire life.  Everything that I
17  needed he's helped me with.  I can call him for anything and he's
18  right there.
19  Q.  Give the judge an example of -- you know, or a couple of
20  examples of some things that you might call him about before the
21  wreck.
22  A.  Before the wreck.
23      So we live in a property that's, you know, right there in
24  front of my parents.  So it's very convenient having them there.
25  Since my husband can't do a lot, you know -- like our septic

1  system got stopped up one time and we needed to do some

2  replumbing.  And my daddy did all that work for us.  We put a

3  garage up.  He is the one that transported it and put it up and

4  done everything and had no issues doing that.

5  Q.  You beat me to it.

6      Any issues with the right foot and getting around and helping

7  with those projects?

8  A.  No.

9  Q.  And those projects would have been done before the wreck?  Do

10  you know approximately when?

11  A.  I don't but they were definitely before the wreck.

12  Q.  What did your dad like to do before this wreck or what was he

13  passionate about?

14  A.  As he stated, going to church.  He was there almost every time

15  the doors was open.  He loved to fish.  He'd go fishing all the

16  time.  And he would do some hunting.

17  Q.  What did he hunt.

18  A.  Deer.

19  Q.  We talked a lot about Freddie helping out other folks.  Do you

20  know who Kenny Johnson is?

21  A.  I do.

22  Q.  Who is Kenny Johnson?

23  A.  He is our neighbor that lives at the end of the road.  He is

24  older than daddy and daddy helps him out a lot.

25  Q.  Talk a little about that.  How does he help our?

1          MR. ELLIS:  Kenny was supposed to be here, Your Honor,

2  but he got sick and was unable to make it.

3  BY MR. ELLIS:

4  Q.  Tell the judge a little bit about how Freddie helps out Kenny?

5  A.  Well, sometimes Kenny isn't able to drive to his doctors'

6  appointments in Athens and stuff.  So before the wreck, daddy

7  would drive him and carry him places and now he is not always able

8  to do that.

9  Q.  Kenny ever brake down over at Athens?

10  A.  Yes.

11  Q.  Oh -- go ahead.

12  A.  And daddy was the first one he called.

13  Q.  Did he go out and get him?

14  A.  I believe he did.

15  Q.  Talk a little bit more about -- so you live near your parents.

16  Did you ever go out and walk with your dad before the wreck?

17  A.  Yes.  We live -- it used to be a dirt road growing up.  But

18  they paved it.  We don't have a lot of traffic but we walked to

19  the end of the road.  If you walk one way, it's a mile and back.

20  We used to be able to do that.  We tried it after the surgery, I

21  want to say last year, August, September, and he barely made it

22  half way.  And we had to stop when his foot was swelling up.  So I

23  had to get my mother to come pick him up.

24  Q.  Before the wreck how often would you all make that walk?

25  A.  Maybe two to three times a week.

1  Q.  And any issues with him getting there and back?

2  A.  No.

3  Q.  As far as his right foot went.

4  A.  No.  He's always been able to walk and go and do whatever he

5  wanted to.

6  Q.  And I want to talk a little with you about what kind of

7  physical shape your dad was in before the wreck.  Describe to the

8  judge what kind of physical shape he was in in the years leading

9  up to the wreck?

10  A.  He always loved wood fireplaces.  He's put a Buck stove in

11  every house that we've lived in.  And he would cut wood almost all

12  year round.  He would have it squirreled away, like squirrels do

13  the nuts, in different stacks.  So when the winter comes, he

14  would -- he was able to use the chain saw and wood splitter and

15  load it and everything.  Whereas, now, he would get people to help

16  him with the chain sawing part and all of that.  All he is able to

17  do is split and just run the wood splitter.  Because at least he's

18  not standing on his feet and it is not hurting him as bad.

19          MR. ELLIS:  I want to be respectful of you, Freddie.

20  BY MR. ELLIS:

21  Q.  Did your dad look like this physically?

22  A.  He did.  He has always been -- I don't know -- probably around

23  225, 230-ish, you know, pretty good shape.

24  Q.  After -- I guess after the wreck did he ever put on my weight?

25  A.  Yes.

1  Q.  Talk a little about that.

2  A.  Because of having to be bedbound for so long, and with all of

3  the different medications, you know, it makes you hungry.  And he

4  got up to 292 pounds.

5  Q.  Talk a little bit about before the wreck.

6      Preacher Durham talked a little about Pigeon Forge.  Now would

7  you go up to Pigeon Forge with your dad?

8  A.  I didn't.  That would be something that they always did.

9  Probably the last time that they went -- you know, Nevaeh is older

10  now.  She used to go with them when she was a toddler.  Once she

11  got older and would not sit still at conventions, I would stay

12  home and work and I would let them go.

13  Q.  When your dad came back from Pigeon Forge, any issues with his

14  foot before the wreck?

15  A.  No.  No.  He was good.

16  Q.  I want to talk a little bit about Ms. Reba.  Just remind the

17  Court who Ms. Reba is?

18  A.  Ms. Reba is the -- she was 88 and went to church with us.  And

19  she was like a grandmother to me.  So daddy would always go pick

20  her up on Sundays.  And she didn't go on Wednesdays.  But before

21  the wreck, you know, he would always go and pick her up and I

22  remembered -- I think it was after the wreck, you know, if he was

23  not able to go get her, he made sure that I got up in time and I

24  went and got her.

25  Q.  How did that come to be?  How did your dad get connected with

1   Ms. Reba and start taking her to church?

2   A.   It was through church.  Because I think she's always been to

3   Bethany.  I don't know if he found out that, you know, she didn't

4   have a ride every Sunday.  Her daughter didn't go there.  She went

5   to another church.  I'm assuming he found out she needed a ride

6   and, you know, just volunteered to do it.

7   Q.   Did he ever complain about doing that every Sunday?

8   A.   Nope.  No.  He loved chatting with misery about a, she was

9   full of wisdom and knowledge.

10  Q.   And before the wreck did he ever make any excuses to you about

11  why he could not take Ms. Reba?

12  A.   No.

13  Q.   And in one or two words, how would you describe your father

14  before this wreck?

15  A.   Physically fit, outgoing, loved the outdoors, not a homebody

16  whatsoever.

17  Q.   I want to take you to the day of the wreck, July 16, 2019.

18  How do you first learn about the wreck?

19  A.   I was at my office in Athens and it's 10:00-ish in the

20  morning.  I think I was on my break in the break room and I got a

21  phone call from daddy.  And he said, "I don't want to panic you

22  but I've had a wreck on the interstate."  You know, my first thing

23  is let me get there as quick as I can.  He said, "No.  I think I'm

24  okay.  I'm just sitting here on the side of the road," you know.

25  "You just call your mama and let her know."

1  Q.  How did he sound to you when he called?

2  A.  Shaken up, you know, nervous like he almost got hit by a

3  semitruck.

4  Q.  Does he get like that often?  Have you heard him talk like

5  that often?

6  A.  No.

7  Q.  And I want to talk generally since the wreck.  What changes

8  have you seen in your dad since the wreck, not just physically but

9  globally?

10  A.  Yeah.  I mean, he's been home the most ever since 2019.  You

11  know, as far as, you know, having to stay at home.  I mean, I

12  could see a change in him, you know, mentally you know.  It

13  gets -- it gets exhausting and draining, you know, only being able

14  to go from your bedroom to the bathroom, you know, and not be able

15  to get out and go, especially when he is as active as what he was.

16  Q.  And were you there for him, I guess, during the three

17  surgeries he's had since the wreck?

18  A.  Yes.

19  Q.  And can you tell the judge just briefly, based on what you

20  saw, how did these surgeries impact your dad.

21  A.  It's almost as if somebody's kind of draining the life out of

22  him, you know.  I mean, he knew he had to keep going because he

23  had grandchildren and me and mama.  But you could tell it was hard

24  on him.

25  Q.  And before the third surgery when his foot got infected after

1  the second one, I guess it was Dr. Johnson's first surgery, did

2  you see the infected foot?

3  A.  I did.

4  Q.  And what were your thoughts about the foot when Dr. Johnson

5  called and said, "You need to get down here for this surgery"?

6  A.  I thought it was very much needed, you know, because when I

7  seen, you know, the red going up his leg, I told daddy, "I'm

8  pretty sure you've got some sort of staff infection or something

9  in there.  You need to get ahold of Dr. Johnson."

10 Q.  What are some of the thoughts or feelings running through your

11 mind when you saw that?

12 A.  That he was going to lose his foot.  It wasn't that bad.

13 Q.  How did that affect you?

14 A.  I mean, upset, you know, to have a very active father.  And

15 for him to lose a foot is a huge ordeal.

16 Q.  Did you believe he shared that same fear?

17 A.  I think so, as well.

18 Q.  What did you see?  Did he say anything to you about the fear

19 of losing his foot?

20 A.  He did.

21 Q.  Did he look scared to you?

22 A.  Yes.  And as you can tell he kind of gets quiet.  He's a

23 talker.  But I think when he has some fear or anxiety of what's to

24 come, he just gets quiet.

25 Q.  I want to talk a little bit about -- were you there when he

1  was treating with the fluids at home?

2  A.  Yes.

3  Q.  And will you just talk with the judge and walk him through

4  what that looked like from what you saw and did?

5  A.  Well luckily since Covid, we came home to work.  And when the

6  home health nurse come up there, I was up there to make sure that

7  I knew how to administer all of this fluid and I let me work know

8  what was going on and told them, you know, I needed 10,

9  15 minutes, I want to say, every four or six hours I would have to

10  go up there and start the medication.  As soon as it got done,

11  they would call me and I would run back up there and I would take

12  it out.

13  Q.  How long did that last?

14  A.  Two or three months.

15  Q.  And I think I heard you, but how many times a day roughly were

16  you having to do that?

17  A.  I can't remember for sure but it was either four -- every four

18  hours or every six hours.  It seemed like it was two or three

19  times during the day.

20  Q.  And was that you always doing that or was he able to

21  self-administer or were other folks helping out?

22  A.  No.  He was not able to administer it.  I pretty much did it.

23  I was the primary person.

24  Q.  Talk a little bit more about after the wreck.

25      Were you all able -- ever able to go on those walks again,

1  other than the one time you described where your mom had to come
2  down and pick up your dad?
3  A.  No.
4  Q.  Do you believe your dad's the same today as he was before the
5  wreck?
6  A.  No, I don't think so.
7  Q.  Explain why not.
8  A.  Sometimes I can tell when his foot's really hurting, you know.
9  Before the wreck, let's see, the kids would have been two and
10 three.  And he was, you know, very active with them, playing
11 outside.  And, you know, the kids started T-ball and that kind of
12 stuff.  After the wreck they started T-ball and he wasn't able to
13 be as active with them and maybe he'd come to one, maybe two
14 games, you know.
15 Q.  How did that impact him, do you think, from what you see on a
16 daily basis?
17 A.  I mean, I think, you know, he was sad and disappointed by
18 that.  You know, he wanted to be there.  But physically to go down
19 there -- and it wasn't a short walk from the parking lot to the
20 ball field and he just knew he couldn't do it every time.
21 Q.  Hearing you today, and correct me if I'm wrong, but it seems
22 like you kind of put your dad up on a pedestal and really look up
23 to him, almost like a hero.
24 A.  I do.
25 Q.  How does it make you feel to see your dad this way after the

1  wreck?

2  **A.**  I think as adult children, we all come to that point.  But you

3  think about it when they're 80 and 90 versus 60 and disabled

4  because of this foot, you know.  So it really makes me sad.

5  **Q.**  Can you expand upon that?  Not just saying that -- but can you

6  expand about how it makes you feel seeing him this way?

7  **A.**  Well, I mean, you know, for him not to be able to, you know,

8  help out like he wants to, you know -- I mean, like I said, it's

9  just sad and heartbreaking, you know.

10  **Q.**  Are you able to tell the Court the ways your dad tries to act

11  like he did before the wreck?  So in other words today, how he

12  tries to act like he did before the wreck.

13  **A.**  Like with -- you know, cutting up his wood, he still tries to

14  do it but then he realizes his limitations and has to stop.  If

15  people call and need help with something, you know, his automatic

16  answer is, "Yeah, you know I'll be there."  And then he kind of

17  has to think if I do that, my foot's going to swell up and that

18  kind of stuff.  Like we said before, he always makes sure someone

19  helps that person in need.

20  **Q.**  And have you ever seen him try to maybe hide how this wreck

21  has impacted his life?

22  **A.**  Yeah.  I mean, I think he puts on a brave face, you know, for

23  us.  So that I guess we don't, you know, feel so bad for him and

24  thinks that he can go and do because he doesn't want to say he

25  can't.

1 Q. Just a couple more questions.

2 But do you believe that this wreck has had an impact on your
3 dad more than just physically?

4 A. Yes.

5 Q. Can you just explain that and why you say that to the Judge
6 and what you mean by that?

7 A. I mean, like we've said, you know, he was a very outgoing
8 person, you know, very chipper, very happy, you know. And then
9 sometimes I would come in, you know, and he'd just be laying in
10 the bed, you know, kind of doom and gloom. You know, and I'd try
11 to cheer him up. He's just in so much pain, you know, sometimes
12 it's just hard.

13 Q. Is it hard on you?

14 A. It is.

15 Q. Hard on you to see him that way?

16 A. Yeah. Yeah, it really is.

17 Q. What's the number one thing you want the judge to know how
18 this wreck has affected your dad? And take your time.

19 A. Yeah.

20 Q. The number one thing you want the judge to know.

21 A. I think the number one thing would just be his physical
22 ability to do what he wants to do, you know, just get up in the
23 morning and go and not have to worry about, well, is my foot going
24 to swell up. If it does, you know, I need to come back to the
25 house and elevate my foot, you know.

1 When friends call, you know, wanting him to go on fishing
2 trips, you know, I heard him many times turn them down and that
3 just wasn't like my daddy beforehand.

4 Q. How would describe your dad beforehand?  In a word or two how
5 would you describe him?

6 A. Outgoing, energetic.

7 Q. Helper?

8 A. Most definitely.

9 MR. GOULD:  Those are all the questions I have, Your
10 Honor.

11 THE COURT:  Thank you.  You may step down.

12 THE WITNESS:  Thank you.

13 MR. ALEXANDER:  Judge, I would tender at this time.
14 Plaintiff's Exhibit Number 22, which is essentially my affidavit
15 as it relates to attorney's fees.  And it contains in it Exhibit
16 A, which is the time records of Mr. Gould and I, compiled in my
17 office.  There are some other times there.  Exhibit B, which is
18 Mr. Ellis's time.  And I think Exhibit C is a two-page document
19 that contains the legal expenses that we've incurred in this case.

20 THE COURT:  Very well.  It's admitted.

21 MR. ALEXANDER:  And then I'd also tender -- I would
22 Exhibit Number 23, which is our, engagement letter with Mr. Cagle
23 basically where he agreed to a contingency fee 40 percent of the
24 gross proceeds of any recovery.  That's dated November 7, 2019.

25 THE COURT:  It's admitted as well.

1          MR. ALEXANDER:  Judge, finally, if I could just have a
2   moment to consult with Mr. Ellis and Mr. Gould, I think that may
3   be the conclusion of our presentation.
4          THE COURT:  Yes, sir.
5          (Discussion off the record.)
6          MR. ALEXANDER:  Judge, I think that will be the
7   conclusion of our evidence.
8          Again, I'm sensitive to the judge's inquiry as it
9   relates to the issue of apportionment.  You tell me when you want
10  us to get you some more information about that.
11         THE COURT:  Tell me what time you need.
12         MR. ELLIS:  A week.  I think it's pretty
13  straightforward.
14         MR. ALEXANDER:  We'll get it to you before next Monday.
15         THE COURT:  That's fine.
16         MR. ALEXANDER:  And earlier if possible.  And then I
17  think as relates to scheduling, I think Mr. Gould just has a
18  relatively short closing presentation he would like to present to
19  the Court and then I think that will be the presentation of our
20  evidence.
21         MR. ELLIS:  And if Your Honor will allow just to set up
22  all the technology and stuff.
23         THE COURT:  Why don't we take a five-minute break.  When
24  you're ready, let Ms. Kemp know and we will go with it then.
25         MR. GOULD:  Okay.  Thank you, Your Honor.

1          THE COURT SECURITY OFFICER:  All rise.

2          (Recess.)

3          THE COURT SECURITY OFFICER:  Be seated.

4          You may proceed.

5          MR. GOULD:  Yes, Your Honor.  May it please the Court.

6          For nearly ten years defendants Calzada and Cordero have

7     openly and knowingly flouted the Federal Motor Carrier Safety

8     Administration and the safety rules that govern their trucking

9     business.  And for ten years they have successfully avoided any

10    meaningful consequences for their actions by acting as a chameleon

11    carrier, opening and closing businesses to stay one step ahead of

12    their safety obligations.  And this horrific July 16, 2019, wreck

13    was a direct result of years of their indifference.  Simply put

14    these defendants have long consciously disregarded their safety

15    responsibility to folks like Freddie.  And for the last ten years

16    it's worked.

17         So it comes as no surprise they have approached this

18    lawsuit in the very same way.  Total disregard for this Court's

19    authority, unwilling to confront any semblance of responsibility

20    for what their actions caused.  And they fully believe that by

21    ignoring this Court's authority, they will avoid any real

22    consequence.  And why wouldn't they?  Conduct rewarded is conduct

23    repeated.  And for ten years they have seemingly been rewarded for

24    their repetitious, reckless conduct.

25         Bottom line, these defendants in default do not care how

1  their actions impact others on the road, including Freddie.  And
2  they're not going to care, Your Honor, until there are
3  consequences that force them to care.

4          So, as Mark mentioned earlier, we're here today for one
5  simple reason accountability.  It sounds simple.  But it's
6  something these defendants in default have evaded since getting
7  into the trucking business, which raises the question:  What does
8  accountability look like here in this case?

9          Well, the Court heard from Freddie, his family, friends.
10 It's rare in life to have the opportunity to meet a Freddie Cagle.
11 That's why so many folks love Freddie because Freddie loves so
12 many folks.  Freddie is the guy in everyone's cell phone they can
13 call day or night and know he will drop everything to be there and
14 help however he can.  Freddie never stops to ask why or come up
15 with an excuse.  He just helps.  In fact, on the day of the wreck
16 he was helping his aunt by driving her to her doctor's
17 appointment.  That's who he is.  He's a helper.

18         In this unique case there's next to no dispute this
19 wreck caused significant injuries to Freddie, which is why we're
20 asking the Court to return a significant verdict.

21         And while Freddie has incurred over $300,000 in medical
22 bills, as the Court has heard, that pales in comparison to the
23 affect this wreck has had on Freddie's life.  Freddie's right foot
24 has been in pain since the day of the wreck.  Every step has hurt.
25 The constant pain and swelling has interfered with his normal

1   living and greatly impacted his enjoyment of life.

2            He has lost much of his mobility.  And in many ways his
3   lack of mobility and impairment of his bodily health and vigor
4   have stripped him of his freedom.  Freedom to do what he wants
5   when he wants.  Freedom to pursue his passions such as fishing,
6   hunting, or working in his yard.  Freedom to be there at a
7   moment's notice when someone calls.  Freedom to be a helper.
8   Freedom to be who he is, Your Honor.

9            Simply put, it has limited his daily activities
10  significantly and that has taken a toll on Freddie mentally.  On
11  his worst days he struggles to sleep and is unable to get up off
12  the couch.  And as he told the Court there's only so much Andy
13  Griffith and *Gunsmoke* he can watch.  To make no mention of the
14  toll on Freddie from the PICC line being stuck in and the months
15  laid up in his house, mostly in his bed, administering the fluids
16  to fight off the infection.

17           Then there's the fear.  The fear he's carried with him
18  since the first moment he realized this was not a routine rolled
19  ankle.  When the pain and swelling would not go away, when the
20  second surgery resulted in a serious infection -- so serious that
21  he called his preacher terrified he was going to lose his foot.
22  Then there's the fear of the future and what his mobility will be
23  as he ages, which he testified he thinks about often.  These are
24  the consequences left in the wake of the wreck.  The consequences
25  that have been ignored by the defendants in default who could not

1   care less about any of it.  And by refusing to participate in this
2   litigation, despite having knowledge of it, Your Honor, the
3   defendants in default have shown zero interest in learning the
4   affects of their conscious disregard for the safety of others.

5        They simply do not care, Your Honor.  And that in and of
6   itself is dangerous.  Their actions leave no doubt they will
7   continue their pattern of reckless indifference until a full,
8   fair, and just verdict is entered against them.

9        And I echo Mark's point from the opening.  The system,
10  the Federal Motor Carrier Safety Administration system only works
11  when motor carriers like these, who openly flout the safety rules,
12  are held accountable.

13        Now, given the permanent life-altering consequences
14  admittedly it was difficult for us to determine a value that would
15  hold these defendants accountable but also be reasonable.  So I
16  want to spend a brief moment with the Court to walk through how we
17  reached our number.  As I mentioned earlier Freddie's right foot
18  has been in pain since the wreck and every step hurts.  So we
19  first looked at steps as a measuring tool.

20        We looked at the average number of steps of an average
21  adult who is not particular active gets in per day, which is
22  roughly 5,000 steps a day, Your Honor.  A year is just shy of two
23  million steps a year.  And if we look at from July 2019 to the end
24  of 2022, Mr. Cagle's walked approximately 6.4 million steps.

25        When we look at the 1949 Ultimate Annuity Table found in

1  the Georgia code, Freddie is 62 and can reasonably expect to live

2  another 17 years.  Although his mother's 88 and turns 89 in May,

3  if we just look at the 17 years and combine them with the three

4  and a half, that's 20 and a half years of walking, which equals

5  over 37 million steps.

6         So we then discuss what value -- or what the value of

7  each painful step should be or is worth.  And if you look at it as

8  just a dollar, Your Honor, that's a $37 million figure.  But if

9  you cut that in half, that's $18 million, nearly $19 million.  And

10  if you cut that in half and it's just a quarter, which is next to

11  nothing these days, it's still over $9 million.

12         But at the end of the day, as I referenced before, we

13  were striving to be reasonable while also coming up with a number

14  that held them accountable.  And candidly, Your Honor, to provide

15  the Court with a number that we believe Freddie has a real

16  opportunity to collect.

17         Therefore, despite being significantly less than the

18  numbers we see here.  We believe a compensatory verdict in the

19  amount of $3,075,000 accomplishes those objectives.

20         And I'll close with this.  This case has been a long and

21  in many ways a painful journey for Freddie.  He is undoubtedly

22  ready for these defendants to finally know what accountability

23  looks like and feels like.  And we trust that they will, Your

24  Honor.

25         Thank you.

1          THE COURT:  Thank you.

2          MR. ALEXANDER:  Judge, I don't think we have anymore

3    presentation for the Court.

4          THE COURT:  Thank you.

5          I will be taking the matter under advisement.  As you

6    heard us discuss earlier, there's a legal issue out there I've

7    asked counsel to assist me with.

8          There are no major surprises here.  I will find in favor

9    of the plaintiff.  It's a default case.  The Plaintiff is entitled

10   to recover.  The specific amount of damages I cannot say today.  I

11   want to take the numbers that have just been given to me.  Let me

12   put your minds at ease.  I think we're in the right ballpark here

13   in terms of the amount of damages that are appropriate in the

14   case.  But I need to exercise my discretion in putting the numbers

15   placed in the blanks in the proposed ordered here.

16         Typically in a trial, you would have a jury in the box

17   and at the end of the day they would walk back in and the

18   foreperson would stand and read a verdict and say:  We, the jury,

19   find in favor of the plaintiff and award X dollars as damages.

20         I will enter a judgment similar to that.  But because

21   I'm doing it without a jury, I have to make certain findings of

22   fact and conclusions of law.  It also affords me the opportunity

23   to say something even beyond that.  And I say to you that I'm

24   certainly sorry that you've had to experience what you have

25   experienced.  And the process here is one that's foreign to you.

1   This is not your every day life.  For the guys sitting at the

2   table with you and us, this is what we deal with.  I know it's

3   easy coming here and think what the heck is going on?  How does

4   all this work?  And there's not a fine science to it.  There's not

5   a calculator you put it in and you calculate out what the result

6   is.

7           It's a judgment call and an exercise of discretion.

8   It's -- for me it comes from -- I won't tell you how many -- but a

9   lot of years of sitting here and doing this.  And looking at what

10  happens in other cases and what happens here, trying to evaluate

11  what you've endured to bring you to this day and to properly

12  compensate you for that.

13          The bad news is this black robe comes with limited

14  powers.  I don't have the power to fix your foot.  If I did, you'd

15  trade every dollar they've asked for to get your foot right and I

16  know that.  But I don't have that power.  There are days I wish I

17  had more power than I did.  Some days I wish I didn't have what I

18  have but I don't have that.  So we in our system determined that

19  these matters will have to be addressed through dollars and cents.

20  And that's the only way that we have to add.  So I will enter a

21  judgment that whatever the number is -- and I don't know how

22  you'll react to it because I don't get to hear that part of it.

23  But whatever the number is, please know that it comes with the

24  recommendation on my part of everything that you've said here.

25          I find no basis at all disbelieving anything that I've

1  heard here today.  And it's all been credible and genuine and I do

2  find that it is all factual and will be using that as a bedrock

3  for the decision that I'll be making in the case.  What has been

4  offered here has been proven -- everything that has been offered.

5  And I will be using that as a basis in making a decision.

6          One hope is that this closes a chapter for you.  This

7  has been hanging over you for several years in terms of how does

8  this come out?  How does this end?  In another week or so you can

9  close this chapter and get on with your life.  I hope for you and

10  your family and your friends that you will be able to squeeze

11  every ounce of enjoyment out of every day you have left.  As you

12  said yourself we don't, any of us, know what that is.  But I hope

13  that you will be able to squeeze every bit of enjoyment out of

14  life possible in every day that you have remaining.  I wish you

15  and our family the best.

16          We're adjourned.  Thank you.

17          THE COURT SECURITY OFFICER:  All rise.

18          (Proceedings were adjourned at 12:35 p.m.)

19              Reporter's Certification

20  I certify that the foregoing is a correct transcript from the

21  record of proceedings in the above-entitled matter.

22

23                          /S/Denise M. Stewart, RPR
                            Official Court Reporter
24                          United States District Court
                            Northern District of Georgia

25  Date:  February 22, 2024